# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 4, 2020

Lyle W. Cayce
Clerk

No. 16-51429

UNITED STATES OF AMERICA,

        Plaintiff - Appellee

v.

ROBERT WARREN SCULLY, also known as Robert Scully, also known as Robert W. Scully,

        Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

A jury convicted Robert "Bob" Scully of conspiracy to defraud the United States, conspiracy to commit wire fraud, and three substantive counts of wire fraud, relating to the operation of his company, Gourmet Express. Scully appeals his conviction and sentence, arguing that (1) the IRS agents' search of his home office violated the Fourth Amendment; (2) the Government's timing in its filing of the second superseding indictment violated due process; (3) the five-year delay between the indictment and trial violated his Sixth Amendment right to a speedy trial; (4) the evidence was insufficient to sustain his wire-fraud convictions; (5) his sentence was substantively unreasonable; and (6) the

No. 16-51429

district court erred in imposing restitution.  For the following reasons, we AFFIRM.

## I. Facts & Procedural Background

Scully was the owner of Gourmet Express (Gourmet), a company that produced frozen meals.  Gourmet's other two partners—Scully's nephew, Kevin Scully (Kevin), and Kenneth Sliz—shared ownership and management of the company along with Scully.

Initially, Gourmet bought shrimp for its frozen meals from U.S. brokers—firms that imported shrimp from overseas and resold them in the United States.  Because this approach had high costs, Scully arranged for his sister-in-law in Thailand, Nataporn Phaengbutdee (Nataporn), to inspect shrimp there for one of Gourmet's U.S.-based suppliers.  Nataporn received a commission, which was incorporated into the price Gourmet paid.  Even with the added cost of the commissions, the price Gourmet paid for shrimp was reduced from around $4.80 a pound to $3.50 a pound.

Nataporn, acting at Scully's suggestion, created various companies to work as seafood inspectors for Gourmet.  The first such company was Siam Star.  Scully and Kevin each owned part of Siam Star for about six months, and Scully's wife eventually controlled a majority of its shares.  For tax reasons, Nataporn later operated the business through a different entity, a company called N&D, and later still, to a company she created, Groupwell.  Gourmet was the only food import customer for Siam Star, N&D, and Groupwell.  Nataporn's companies did not physically possess the shrimp Gourmet purchased.  Instead, these companies paid the shrimp producers to ship directly to Gourmet.  Nataporn's commission was for inspecting the product on location at the plant and providing "boots on the ground" to ensure that the shipment was uncontaminated and safe to sell to the customer, and for assuming the risk of a failed shipment.

No. 16-51429

Scully and Kevin received a portion of this commission, often through accounts in their wives' names. Nataporn sent hundreds of thousands of dollars to her sister, Nunchanat, Scully's wife, and Nataporn's companies sent hundreds of thousands of dollars to Mika Kon, who was a relative of Kevin's wife, Terumi.

Scully and Kevin did not disclose these payments on their federal tax returns, nor did they disclose them to their business partner Sliz. When the partnership between Sliz and Scully began to sour, Sliz started investigating and discovered that Gourmet was overpaying for its product and paying a premium to Nataporn's companies. When Sliz asked Scully who owned or controlled the companies, Scully said that he did not know.

The dispute between the partners resulted in civil litigation. Around the time the lawsuit was filed, Scully deleted documents from a folder on his computer labeled "Siam Star" and testified at a hearing that he didn't know how much Nataporn's companies were paying for the shrimp the companies sold to Gourmet; Scully was in fact in touch with the shrimp producers and instructed Nataporn on how to negotiate prices with them. Kevin created spreadsheets tracking the difference between the price Nataporn's companies paid for shrimp and the price those companies charged Gourmet.

The conflict among the partnership resulted in an outside investor, the Ilex Group, purchasing Gourmet. Scully and Kevin were paid millions for their interests in Gourmet and were able to stay on as executives and buy back in as minority shareholders in the company. Ilex bought Sliz's share, and Sliz warned Ilex about the relationship between Gourmet and Nataporn's company, Groupwell. Scully assured Ilex that "the only problem with Groupwell was not documenting the fact that my sister-in-law works there," that Groupwell was an independent entity, and that he and Kevin "weren't really privy to" any financial interest in the company. Scully and Kevin not disclose to Ilex that

3

No. 16-51429

Nataporn controlled Groupwell and that Groupwell's only food import customer was Gourmet. Ilex later terminated Scully and Kevin after the two attempted to have a new Chief Operating Officer fired.

## A. Search of Scully's Home Office

Concerned that Gourmet had been involved in federal crimes while he owned it, Sliz went to the IRS, which launched an investigation. IRS agents secured a warrant to search 1015 East Cliff Drive, which was Scully's residence and, according to a Gourmet company document, was also Gourmet's "West Coast Regional Office." The affidavit submitted to the magistrate judge in support of the warrant explained that Scully "converted a small apartment behind the residence into an office" where he did work for Gourmet and that officers were looking for the sort of evidence that would be found in a home office. The affiant, Agent Gary Ploetz, stated that, in his experience, "business records are kept at addresses listed as a business office." The affidavit further stated that "the latest Gourmet employee phone directory and office listing" listed 1015 East Cliff Drive as an office, and that a phone and fax number were listed for the same address.

Before preparing the warrant, agents reviewed satellite images of the location and drove past it. IRS Agent Demetrius Hardeman prepared the warrant application, and Ploetz acted as the affiant. They had the warrant application reviewed and approved by local agents and the local U.S. Attorney's Office. A federal magistrate judge reviewed and signed both the warrant and the affidavit in support. The agents involved in the seizure were each provided a copy of the warrant before the raid. While the affidavit in support of the warrant explained that Scully's home office was in a building

4

No. 16-51429

separate from the residence, the warrant included a physical description of the primary residence only.[1]

Scully's home office was in fact located at 1015½ East Cliff Drive, a separate building behind the primary residence and down a private sidewalk. The parcel of land contained three structures served by one driveway—the primary residence at 1015 East Cliff Drive, the home office behind the primary residence at 1015½ East Cliff Drive, and a structure to the left of the primary residence that was rented out. In addition to the primary residence, the agents searched the home office at 1015½ East Cliff Drive and seized from that location documents and an image of Scully's computer hard drive. Agent Hardeman instructed Ploetz's team to not search the third structure on the property because it was leased by someone else.

The agents also secured a warrant to search Kevin's home, and inside a cooler hidden in the crawl space underneath the home, agents found records from a foreign bank documenting the transfers to Kevin's wife from Nataporn's companies. The agents also recovered documents tracking the commissions Scully and Kevin received. The searches of both homes uncovered documents showing the commissions and the Scullys' involvement with and monitoring of Nataporn and her companies.

---

[1] The description stated in full:

The location of the premises is at the address of 1015 East Cliff Drive, Santa Cruz, CA 95062 and is described as follows:

- It is a white, wooden, one story residence with green trimming. There is a small wrap-around driveway that has one way in and out. A small sign with house number "1015" is hanging in front of the house from the roof of the porch. The front door has a screen door with green trimming.
- There are large bay-windows in the front left of the residence.
- Residences are only located on the northbound side of East Cliff Drive.
- Facing the residence from the street, there isn't a house on the right side. The home is covered by trees.

No. 16-51429

## B. Indictment and Trial

In July 2010, a grand jury indicted Scully for conspiracy to commit tax fraud and aiding in filing false tax returns.[2]  A superseding indictment in November 2010, in addition to these charges, added one count of conspiracy to commit wire fraud and five individual counts of wire fraud, alleging that Scully and Kevin defrauded Sliz.

### 1. Motion to Suppress

Scully moved to suppress the evidence seized from his office, arguing that the search of the office was unreasonable under the Fourth Amendment because it had a separate street address not listed on the warrant and because the physical description of the property contained in the warrant described only the primary residence and not the separate home office.  At a hearing, Scully presented evidence showing that Pacific Gas and Electric had the primary residence and home office listed as separate accounts at separate addresses.  Agent Hardeman testified that while he knew there was a small apartment/office located behind the primary residence, he did not know that the buildings had separate addresses and did not investigate whether the separate buildings had separate addresses or utilities.  Agent Ploetz did not check with the post office to see if the home office had a separate address.  The agents explained that they had treated the front house and home office as part of the same location during the search, that they did not realize that there was such an address as 1015½, and that they had sought and executed the warrant in good faith.  The district court denied Scully's motion to suppress, finding that "law enforcement's activities [were] reasonable within the Fourth Amendment" and "not in violation of the good faith exception."

---

[2] The charges against Kevin and Scully were one count of conspiracy to commit tax fraud and three counts of aiding and assisting in filing false tax returns.  Additionally, Kevin individually was charged with five counts of filing false tax returns and one count of perjury.

No. 16-51429

## 2. Second Superseding Indictment

Beginning in December 2010, Scully began moving for leave to depose Nataporn and other foreign witnesses to prove that the Thai corporations in the indictment were not shell corporations. The district court originally denied the motion but granted Scully's motion for reconsideration two years later, allowing the depositions in Thailand to go forward in July 2013.

After the first set of depositions in Thailand in October 2013, the Government secured a second superseding indictment that removed the charges against Kevin, who died while the case was pending, and the allegation that Nataporn's companies were "shell compan[ies]." Scully moved first to continue the case based on the second superseding indictment and later moved to strike the second superseding indictment. He argued that the Government "changed the tenor of this prosecution" and explained that his questioning of the witnesses in Thailand would have been different if the second superseding indictment was active at the time the depositions were taken.

The district court denied Scully's motion. After comparing the two indictments, the district court concluded that the Government curtailed, rather than expanded, the charges against Scully. The district court continued the case until March 2014 and allowed Scully to take additional depositions in Thailand based on the second superseding indictment.

Nataporn's second deposition was conducted in February 2014. At the deposition, she produced two letters that she presented as Groupwell business records. Each bore the letterhead of a Thai shrimp producer that had shipped to Gourmet, and each recited that the producer had a commercial relationship only with Groupwell, not Gourmet. The Government detected in the original files evidence that suggested that Scully had drafted the text of the letters and directed Nataporn to have it printed on the shrimp producers' letterhead and sent back to Groupwell and Gourmet. The Government alerted Scully's

counsel and the district court in March 2014 that the letters were potentially fabricated, and the district court postponed trial to August 2014 to allow time for a forensic examination of Scully's hard drive.[3]

Scully moved repeatedly to dismiss the second superseding indictment for post-indictment delay, arguing that trial would not happen soon enough to satisfy the Sixth Amendment's speedy trial clause. In the alternative, Scully requested a continuance until February 2015, which the court granted.

After granting the continuance, the district court denied Scully's renewed motions to dismiss the second superseding indictment for post-indictment delay, reasoning that "the reasons for the delay were not negligence on the part of the Government," "much of the overall delay was due to Defendant's requests," and "there was little danger that the Defendant's defense had been impaired by the delay."

A few months before the trial date, the Government informed Scully's attorney that new discovery was available. The Government had conducted a deeper investigation into Scully's computer and produced new documents it intended to use in its case in chief. Scully argued that the new discovery was overwhelming and that he needed more time to review it and to conduct another set of depositions in Thailand to address the new documents. The district court allowed a third round of depositions in Thailand and rescheduled trial for October 2015.

---

[3] The Government introduced evidence at trial that when the experts reviewed Scully's computer, they discovered that the letters purportedly sent from shrimp suppliers to Groupwell and Gourmet were saved on Scully's computer. The letters' metadata indicated that the document was titled "Please send this letter with SMP letterhead addressed to Groupwell and Gourmet Express" and sent to Nataporn. The two letters purportedly from two different shrimp suppliers were materially identical, including punctuation and spacing errors.

No. 16-51429

### 3. Trial and Sentence

After a fourteen-day trial, the jury found Scully guilty of (1) conspiracy to defraud the United States, (2) conspiracy to commit wire fraud, and (3) three individual counts of wire fraud.  It acquitted Scully of preparing false tax returns.

The district court imposed concurrent, below-guidelines sentences of 180 months on the wire-fraud counts and 50 months on the tax-conspiracy count. It also found that the Government established beyond a reasonable doubt and "certainly by a preponderance of the evidence" that the United States lost $1,206,539.94 in taxes and ordered restitution in that amount.  Scully appeals, arguing the district court committed several errors.

### II. Fourth Amendment

First, Scully argues that the district court erred in admitting evidence seized from his home office because the search violated the Fourth Amendment.  He claims that the officers exceeded the scope of the warrant when they searched the home office behind his house at 1015½ East Cliff Drive because the warrant[4] described only the primary residence at 1015 East Cliff Drive.   The Government argues that the good-faith exception to the exclusionary rule applies because the agents did not commit the sort of deliberate, reckless, or grossly negligent violation that would warrant suppression, and, alternatively, that the good-faith exception is unnecessary because the warrant adequately described the location the agents searched, and therefore the search did not violate the Fourth Amendment.

We review "de novo the reasonableness of an officer's reliance upon a warrant issued by a magistrate." *United States v. Satterwhite*, 980 F.2d 317,

---

[4] The description was in fact included as an attachment to the warrant, and the attachment was cross-referenced in the warrant itself.  We refer to the description as if it were contained in the warrant for ease of reference.

321 (5th Cir. 1992). When evaluating a motion to suppress, "[w]e consider the evidence in the light most favorable to the verdict, and accept the district court's factual findings unless clearly erroneous or influenced by an incorrect view of the law." *United States v. Carrillo-Morales*, 27 F.3d 1054, 1061 (5th Cir. 1994).

In *United States v. Leon*, 468 U.S. 897 (1984), "the Supreme Court held that the Fourth Amendment does not require the suppression of evidence obtained as a result of objectively reasonable reliance on a warrant, even if the warrant is subsequently invalidated." *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999). "We employ a two-step process for reviewing a district court's denial of a motion to suppress when a search warrant is involved." *Id.* We first "determine whether the good-faith exception to the exclusionary rule announced in [*Leon*] applies," and if it does, the analysis ends. *Id.* "If not, we proceed to the second step, in which we 'ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (alteration omitted) (quoting *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129 (5th Cir. 1997)).

The warrant in this case presents two potential issues. First, it listed only the address for the primary residence, 1015 East Cliff Drive, and not the address for the separate home office that the agents searched, 1015½ East Cliff Drive. Second, the warrant's description of the place to be searched described only the primary residence and not the home office. We address each potential problem in turn to determine whether either, or both combined, rendered the officers' actions in searching the home office unreasonable.

## A. No Address

We first address whether the officers were reasonable in searching the home office though it carried a different address. We conclude the agents acted

reasonably and in good faith in their belief that the warrant for 1015 East Cliff Drive authorized the search of the home office.

We have previously relied on the good-faith exception to uphold the admission of evidence obtained from two separate addresses though only one address was listed in the warrant. We applied the good-faith exception in *United States v. Carrillo-Morales*, to excuse the search of 1418 West Avenue pursuant to a warrant authorizing a search of a separate address, 1414 West Avenue. 27 F.3d at 1063-64. The location of 1414 West Avenue contained two buildings: an office building for a body shop business, and an adjoining garage shop. *Id.* at 1058. The defendant "lived in the shop," and the officers searched that residence as well, "which [the defendant] claimed was 1418 West Avenue rather than 1414 West Avenue." *Id.* The search warrant authorized a search of only 1414 West Avenue, the address of the body shop. *Id.* at 1059. In concluding that the good-faith exception applied, we considered that (1) the defendant's residence "was inside the building where the garage area was located"; (2) "[t]he number 1414 was painted on the outside of that building"; (3) "[t]he two buildings on the premises were similar in appearance and separated by an awning"; and (4) "the name Crown Paint and Body Shop was on both buildings." *Id.* at 1064.

Similarly, we upheld a search of two office buildings—located at 9172 Highway 51 N., Suite B, and 9170 Highway 51 N.—where both offices were occupied by the same company, KMC, but the warrant specified only the 9172-B address. *See United States v. Judd*, 889 F.2d 1410, 1412 (5th Cir. 1989). Despite deciding the case on other grounds, we "nonetheless point[ed] out briefly that [the defendants'] substantive complaint is contrary to the well-established law concerning the specificity required in warrants." *Id.* at 1413. We explained that an error in description is not always fatal, that "the agents checked the city business license records, bank records at a local bank,

corporate filings with the Mississippi Secretary of State, and the address on KMC letterhead to ascertain KMC's address," that the offices were in the same building complex, and that "the door to 9170 was only 25 to 30 feet away from the door to 9172-B." *Id.* On those facts, we "conclude[d] that the description of the KMC location contained in the search warrant was sufficient to support a search of the KMC office at 9170." *Id.*

Finally, in *United States v. Melancon*, we concluded that the search of a defendant's residence (located at Route 2, Box 622) and his business (located at Route 2, Box 623) was authorized by warrant listing only the business address as the place to be searched. 462 F.2d 82, 92-94 (5th Cir. 1972). We noted that no fence separated the parcels, and there was a pathway worn between them. *Id.* at 92-93. Moreover, the defendant listed Box 623 as both his business address and residence in his application for a federal firearms license. *Id.* at 93. The district court found no "reason to divide the premises in two lots when the physical aspect of this whole set-up showed it was clearly one establishment with a worn pathway between the two and obviously Mr. Melancon lived in one and worked in the other." *Id.* We affirmed the district court's denial of the motion to suppress, concluding "that the description of Melancon's property provides no basis for the invalidation of the search." *Id.* at 92-94.

Turning to the case at bar, in determining the place to be searched as 1015 East Cliff Drive, the agents relied on the Gourmet corporate documents listing the West Coast Regional Office at that address, including "the latest Gourmet employee phone directory and office listing," and a phone and fax number listed for the that address. They reviewed photographs and satellite imagery, drove past the location, and relied on information provided by Sliz. Though the Government could have done more and with additional research may have discovered the separate addresses, it was reasonable to believe that

the address listed on the company documents as the West Coast Regional Office was in fact the address of the office. *See Judd*, 889 F.2d at 1413 (corporate filings showed only one address); *Melancon*, 462 F.2d at 93 (appellant did not distinguish between business address and residence in application for firearms license). Moreover, no signs or markings indicated that the home office carried a separate address, and both structures were similar in appearance, were contained on a singular rectangular lot within the same fenced area, appeared to be connected by the same utility wires, and were connected by a sidewalk. *See Carrillo-Morales*, 27 F.3d at 1064 ("[t]he number 1414 was painted on the outside of that building" and "[t]he two buildings on the premises were similar in appearance and separated by an awning"); *Judd*, 889 F.2d at 1413 (two offices were in the same building complex and "the door to 9170 was only 25 to 30 feet away from the door to 9172-B"); *Melancon*, 462 F.2d at 92-93 (pathway worn between two structures and no fence separated them). Under the circumstances, the officers acted reasonably and in good faith in not including the address 1015½ East Cliff in the warrant application and in believing that the warrant for 1015 East Cliff Drive covered both buildings.

## B. No Description

We next determine whether the officers were objectively reasonable and acting in good faith in their belief that the warrant containing a physical description of only the primary residence authorized the search of a separate building behind the primary residence. *See Leon*, 468 U.S. at 922-23. Based on the circumstances of this case, we conclude that they were.

Our court and others have upheld searches where the warrant lacked a physical description of a second location searched by the officers. *See United States v. Bansal*, 663 F.3d 634, 663 (3d Cir. 2011) (warrant that authorized search of "premises" at address authorized search of detached garage); *United*

No. 16-51429

*States v. Gahagan*, 865 F.2d 1490, 1492, 1499 (6th Cir. 1989); *United States v. Prout*, 526 F.2d 380, 386 (5th Cir. 1976) (warrant that authorized search of address of real estate office authorized search of apartment with separate address "[g]iven the physical layout of the premises and their use by [the defendants], as observed by surveillance officers" because both premises shared a common foyer and "there was little likelihood that the wrong premises would be searched").

The Sixth Circuit has upheld a search where the officers searched a building not described in the warrant and located at an address not listed in the warrant. *Gahagan*, 865 F.2d at 1492-93, 1499. The warrant in that case listed and described only 7609 Douglas Lake Road, one of four separate dwellings in the rural area, as the place to be searched, but the officers searched one other nearby dwelling that carried a separate address. *Id.* at 1493-94. The Sixth Circuit determined that the search was valid because one of the officers involved in executing the warrant was also the affiant on the application for the warrant, the search was confined to the areas that the officer described, and the officer "conducted a pre search briefing session for those officers who participated in the search and provided them a description of the premises to be searched." *Id.* at 1493. Specifically, that court held "that when one of the executing officers is the affiant who describes the property to the judge, and the judge finds probable cause to search the property as described by the affiant, and the search is confined to the areas which the affiant described, then the search, in this case, is in compliance with the fourth amendment." *Id.* at 1499. We have previously approved the practice of referencing the affidavit supporting the warrant where "the warrant is ambiguous, but fairly directs attention to the place actually searched." *See United States v. Haydel*, 649 F.2d 1152, 1156-57 (5th Cir. 1981). In that case, we concluded:

14

No. 16-51429

When the search warrant is read in conjunction with the affidavit, it is clear that the target of the search was the residence of [the defendant's father]. There was no danger that the less-than-perfect description on the face of the warrant allowed the officers to conduct a random search. When the warrant is read in circumstances' light, the object of the search authorized was clear.

*Id.* at 1157.

Similarly here, the officer who executed the warrant, Agent Ploetz, was also the agent who submitted warrant and the affidavit in support to the magistrate judge. The affidavit, which was submitted to and signed by the magistrate judge alongside the warrant, described Scully's home office, explained that Scully did work for Gourmet there, and that the agents were looking for business records contained in the home office. The judge found probable cause to search the property as described by Agent Ploetz, and the search was confined to the areas described by him. *See Gahagan*, 865 F.2d at 1493-94, 1499 (affiant described property to the magistrate judge, judge found probable cause to search property as described by the affiant, affiant was one of the executing officers, and search was confined to the areas the affiant described).

Prior to executing the warrant, Agent Ploetz met with the other executing agents to make sure they knew what to search, and he testified that "we were clear that we were going to be searching the main house and the additional structures on the property," except for the "rented" structure, which Ploetz instructed not to search. *See Gahagan*, 865 F.2d at 1493 (affiant "conducted a pre search briefing session for those officers who participated in the search and provided them a description of the premises to be searched"); *Haydel*, 649 F.2d at 1157 ("testimony concerning how the search was made demonstrates that the officers knew" what place was intended to be searched). It is "clear that the executing officers were in a position to be aided by [the affidavit]" because Agent Ploetz, as the affiant, knew what the affidavit

15

contained and was instructing agents while executing the warrant. *See Gahagan*, 865 F.2d at 1497 (quoting 2 W. LAFAVE, SEARCH AND SEIZURE § 4.5(a), at 209 (2d ed. 1987)).[5] Because Agent Ploetz was both the affiant and executing officer, and because he instructed the other officers on what places to search, "[t]here was no danger that the less-than-perfect description on the face of the warrant allowed the officers to conduct a random search." *Haydel*, 649 F.2d at 1157; *see also Prout*, 526 F.2d at 388 (though separate apartment was searched, given premises layout and surveillance officers' observations, "there was little likelihood that the wrong premises would be searched—as indeed they were not" (quoting *United States v. Darensbourg*, 520 F.2d 985, 988 (5th Cir. 1975)). "When the warrant is read in circumstances' light, the object of the search authorized was clear," *Haydel*, 649 F.2d at 1157, and therefore the officers acted in objectively reasonable good faith in believing that the warrant in this case authorized a search of the home office.

We therefore conclude that the district court did not err in denying Scully's motion to suppress the evidence found in his home office.

---

[5] Regarding looking to the affidavit in support of the warrant and considering the knowledge of the executing officer when executing a warrant, LaFave notes that if the description in the warrant is inaccurate, "it is appropriate to look to the description appearing in the warrant application or affidavit . . . where . . . the affiant was also the executing officer." 2 SEARCH & SEIZURE § 4.5(a) (5th ed.).

> The basic point is that there should be greater reluctance to take into account other knowledge of the executing officer when the description is facially deficient than when . . . the description is facially sufficient but partially erroneous when compared to the actual description of the premises searched. This is because in the former situation there is greater reason to question whether the information supplied the magistrate in the first instance shows that the investigation has in fact focused upon particular premises.

*Id.* Given the information that Agent Ploetz supplied to the magistrate judge concerning the nature of the charges, what the agents believed Scully kept in his home office, and the object of the search, it is clear that the "information supplied to the magistrate judge in the first instance shows that the investigation . . . in fact focused on" the home office. *Id.*

## III. Due Process

In his second point of error, Scully argues that the Government filing the second superseding indictment, which omitted any claim that the Thai companies were shell corporations, violated due process because it was filed after the depositions in Thailand had occurred, thus giving the Government a preview of Scully's defense and an opportunity to undermine it.　The district court rejected this argument, finding that the Government did not operate in bad faith and that Scully was not prejudiced, and therefore denied Scully's motion to strike on this basis.　We review "de novo a district court's denial of a motion to dismiss the indictment, including any underlying constitutional claims," and review the district court's underlying factual findings for clear error.　*United States v. Cordova-Soto*, 804 F.3d 714, 718 (5th Cir. 2015).

To show that a pre-indictment delay violated the due process clause, a defendant must establish: (1) that "the Government intended to delay obtaining an indictment for the purpose of gaining some tactical advantage over the accused . . . or for some other bad faith purpose," and (2) "that the improper delay caused actual, substantial prejudice to his defense."　*United States v. Seale*, 600 F.3d 473, 479 (5th Cir. 2010).　Scully fails on both prongs.

First, he has not demonstrated that the district court clearly erred in finding that the Government did not act in bad faith.　*See United States v. Avants*, 367 F.3d 433, 442 (5th Cir. 2004) (reviewing for clear error the district court's finding on the Government's intent).　Scully argues that bad faith is demonstrated by the fact that the Government altered the indictment when the deposition testimony revealed that the Thai corporations were shell corporations, and the Government should have been more diligent and uncovered this information sooner.　These actions do not demonstrate bad faith because, as the Government points out, a prosecutor has an obligation to decline to seek an indictment for an allegation he does not believe he can prove

beyond a reasonable doubt, and any failure on the part of the Government to uncover the information and revise the indictment sooner must be characterized as negligent at worst, not deliberate. *See Seale*, 600 F.3d at 480 (explaining that first prong is not satisfied if delay "was investigative rather than tactical").

Second, Scully fails to demonstrate that the district court clearly erred in finding that the delay did not cause his defense actual, substantial prejudice. The district court explained that, based on its review of the two indictments the Government "refined its charges against the defendant by—for all intents and purposes, cutting back not expanding." It also found that Scully was not prejudiced because he had "ample" time to refine his defense accordingly and take additional depositions in Thailand. Scully argues that the additional depositions hurt his defense because they exposed contradictions in the witnesses' testimony and the jury saw Scully's counsel spend time on issues that were no longer relevant. As the Government correctly points out, however, it was Scully, not the Government, that requested that the depositions be played in full rather than merely excerpted.

Therefore, the second superseding indictment did not violate Scully's due process rights and the district court did not err in refusing to strike it.

## IV. Right to a Speedy Trial

Third, Scully argues that the district court violated his Sixth Amendment right to a speedy trial. In determining whether a defendant's Sixth Amendment right to a speedy trial was violated, we evaluate the four factors set out in *Barker v. Wingo,* 407 U.S. 514 (1972): "(1) length of the delay, (2) the reason for it, (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay." *United States v. Parker*, 505 F.3d 323, 328 (5th Cir. 2007) (alteration omitted) (quoting *United States v. Hernandez*, 457 F.3d 416, 420 (5th Cir. 2006). We

review the district court's weighing of the factors de novo and its underlying factual findings for clear error. *United States v. Bishop*, 629 F.3d 462, 466 (5th Cir. 2010).

The first factor "is a 'triggering mechanism' for determining whether the court is required to balance the remaining three *Barker* factors." *United States v. Serna-Villarreal*, 352 F.3d 225, 230 (5th Cir. 2003). The district court found that "the delay of three years between the first superseding indictment and the second superseding indictment is sufficient for the Court to engage in a full analysis of the *Barker* factors." We agree.

Regarding the reason for the delay, "delays caused by defense counsel are properly attributed to the defendant." *Vermont v. Brillon*, 556 U.S. 81, 94 (2009). Here, the majority of the five-year, three-month delay[6] between the original indictment and trial was attributable to Scully, who requested three years' worth of continuances for various reasons, including allowing his counsel to prepare for trial, to accommodate his teaching schedule and other cases, to resolve civil litigation related to the charges in the indictment, to take depositions in Thailand, and in light of Kevin's death.

At most, then, one year and nine months of delay is attributable to the Government. "[W]hen evaluating delay-length, courts must consider the complexity of, and facts for, each case." *United States v. Frye*, 372 F.3d 729, 737 (5th Cir. 2004). Some delay is tolerable in a complex fraud and conspiracy case that required foreign depositions and wherein one of the defendants died before trial. *See Barker*, 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex

---

[6] While delays of five years or more may give rise to a presumption of prejudice and relieve the defendant of satisfying *Barker*'s fourth prong, *see Bishop*, 629 F.3d at 466, Scully does not brief this argument and has therefore waived it, *see United States v. Ogle*, 415 F.3d 382, 383 (5th Cir. 2005).

conspiracy charge."). "[D]ifferent weights should be assigned to different reasons." *Id.* While "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.*

The district court concluded that the Government did not act in bad faith and its actions in failing to do various things sooner—including interview witnesses in Thailand, conduct a full review of Scully's computer, and seek a warrant for Scully's email account—did not amount to negligence. Scully's arguments to the contrary notwithstanding, we find no clear error in the district court's finding. *Doggett v. United States*, 505 U.S. 647, 652 (1992) (explaining that district court's finding that delay was not the result of Government negligence is entitled to "considerable deference").

Considering the third factor, the district court found that Scully did not diligently assert his Sixth Amendment rights because, though he "immediately assert[ed] his rights following the second superseding indictment, . . . this case has been put on hold numerous times at his request." We agree with the district court that "it is clear that much of the overall delay was due to Defendant's requests."

Finally, the district court found that Scully was not prejudiced by the delay. It explained that "[b]ecause this case has been progressing towards trial, albeit slowly, there is little danger of [Scully's] defense being impaired by loss of memory or exculpatory evidence." Scully "bears the burden of establishing actual prejudice and demonstrating that such prejudice is sufficient to outweigh the other three factors." *Bishop*, 629 F.3d at 465 (quoting *United States v. Frye*, 489 F.3d 201, 209 (5th Cir. 2007)). He has failed

to meet this burden.  Scully reiterates the argument he made in the district court that the delay prejudiced him because the second superseding indictment gave the Government a preview of his defense, therefore allowing the Government to undermine his defense and alter its theory of the case.  He also complains that the Government secured a search warrant for his email based on the first round of depositions in Thailand.

The district court did not clearly err in finding that the second superseding indictment did not prejudice Scully, and Scully has not pointed to any specific error in the district court's findings, instead repeating the arguments he presented in the district court asserting broadly that the court erred in rejecting them.  *See Macklin v. City of New Orleans*, 293 F.3d 237, 241 (5th Cir. 2002) (declining to address defendant's argument where "[r]ather than attacking the district court's reasoning . . . , [the defendant] has chosen to merely conclusorily state that the district court erred").  "The Government's continuing preparation during [a] delay"—securing a search warrant for Scully's email based on potential fabrication of business records uncovered after the second round of depositions—"does not constitute prejudice."  *Frye*, 372 F.3d at 741.  As for Scully's claim that the second superseding indictment "made it appear that counsel spent inordinate time on issues without basis in the indictment," as the Government points out, Scully's counsel insisted that the depositions be played in their entirety and in fact pointed out to the jury that the Government changed course from its initial theory that the companies were shell companies.  Having weighed the four *Barker* factors, we conclude that Scully's Sixth Amendment right to a speedy trial was not violated.

## V. Sufficiency of the Evidence

Fourth, Scully argues that there is insufficient evidence to support his convictions for wire fraud and conspiracy to commit wire fraud because the Government did not prove he engaged in a scheme to defraud and that he

lacked the requisite intent.  We review the sufficiency of the evidence de novo, but our review is "highly deferential to the verdict."  *United States v. Carbins*, 882 F.3d 557, 563 (5th Cir. 2018) (quoting *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017)).  We must "determine whether, viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt."  *Id.* (quoting *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016)).  We "draw all reasonable inferences and make all credibility determinations in favor of the verdict."  *Id.* (quoting *Mahmood*, 820 F.3d at 187).

To prove wire fraud, the Government must establish both a scheme to defraud and a specific intent to defraud.  *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018).  Conspiracy to commit wire fraud likewise requires that the defendant joined the conspiracy with the "specific intent to defraud."  *United States v. Brooks*, 681 F.3d 678, 700 (5th Cir. 2012).

To establish that Scully engaged in a scheme to defraud, the Government must prove that he "made some kind of a false or fraudulent material misrepresentation."  *Spalding*, 894 F.3d at 181 (quoting *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016).  Misleading omissions qualify as false representations.  *See Pasquantino v. United States*, 544 U.S. 349, 357 (2005).  As for intent to defraud, this element is satisfied "when [a defendant] acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself."  *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018) (quoting *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir. 2014)).  A jury can infer intent from the facts and circumstances.  *United States v. Rivera*, 295 F.3d 461, 466-67 (5th Cir. 2002).

No. 16-51429

Viewing the evidence and drawing all reasonable inferences in the light most favorable to the verdict, we conclude that the evidence was sufficient to support Scully's convictions for conspiracy to commit wire fraud and three substantive counts of wire fraud.

First, a reasonable jury could conclude that Scully engaged in a scheme to defraud.  Sliz testified that he was unaware that Scully and Kevin were receiving distributions from the suppliers, that Scully never discussed his sister-in-law's control over Groupwell, N&D, and Siam Star, and that Scully denied knowing who owned those companies, while other evidence suggested he in fact knew it was his sister-in-law.  Sliz testified that it was important for him to know whether Gourmet was overpaying for shrimp and whether the money was "disappear[ing]," because that money belonged to the company. Scully argues that he was only trying to save Gourmet and that Nataporn's companies provided a great benefit to Gourmet.  Even assuming those explanations somehow refute the evidence of the commissions Scully received, a jury was entitled to reject those explanations and instead credit Sliz's testimony.  *See Spalding*, 894 F.3d at 181; *see United States v. Little*, 889 F.2d 1367, 1368 (5th Cir. 1989) (explaining that an "entity suffers a property loss when a contractor gives a kickback from his own money, even when he was the low bidder, because the contractor was willing to sell his product . . . for the stated price less the kickback amount").

Second, a jury could reasonably infer Scully's intent to defraud from the facts and circumstances.  *See Rivera*, 295 F.3d at 469.  Viewing the evidence most favorably to the verdict, Scully was receiving commissions from Nataporn's companies, thus bringing about financial gain, and acted knowingly and with specific intent to deceive because he concealed the commissions from Sliz and lied to about knowing who owned Nataporn's companies.  A jury was entitled to reject Scully's argument that his only intent

23

was to save Gourmet and accept the other evidence—including Sliz's testimony and the spreadsheets and correspondence describing the commissions—that showed Scully's commission and his hiding it from Sliz.

Accordingly, there was sufficient evidence to convict Scully of wire fraud and conspiracy to commit wire fraud.

## VI. Substantive Reasonableness of Scully's Sentence

Fifth, Scully argues his below-guidelines 180-month sentence is greater than necessary to satisfy the 28 U.S.C. § 3553(a) purposes and is therefore substantively unreasonable because the sentence overstates the seriousness of Scully's offenses, is not necessary to protect the public, and does not promote respect for the law. "A sentence below the Guidelines range is presumptively reasonable." *United States v. Broussard*, 882 F.3d 104, 113 (5th Cir. 2018). To rebut that presumption, a defendant must show that the sentence "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Simpson*, 796 F.3d 548, 558 (5th Cir. 2015) (quoting *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013)). Scully does not contend that the district court failed to account for a factor, nor does he identify any irrelevant or improper factor to which the district court gave significant weight. He simply argues that the district court should have weighed the factors differently. We have "consistently declined to merely reweigh the sentencing factors," *United States v. Ayelotan*, 917 F.3d 394, 409 (5th Cir. 2019), and we decline to do so today.[7]

---

[7] As his sixth and final point of error, Scully argues that the district court's ordering him to pay more than $1 million in restitution violates the Sixth Amendment because the court, not the jury, made the factual findings to support the restitution. Scully recognizes that this argument is foreclosed by our precedent, *see United States v. Rosbottom*, 763 F.3d

No. 16-51429

**\* \* \***

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

408, 420 (5th Cir. 2014), and "raises the issue of the rule's applicability to preserve it for possible review by the Supreme Court."