# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 1, 2023

Lyle W. Cayce
Clerk

————————

No. 22-10460

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Bryan Reshad Hill,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-86-20

_____

Before Duncan and Wilson, *Circuit Judges*, and Schroeder, *District Judge*.[*]

Cory T. Wilson, *Circuit Judge*:

A jury found Bryan Reshad Hill guilty of conspiring to possess a controlled substance with the intent to distribute it and distributing a detectable amount of a substance containing cocaine base. Hill now challenges his sentence on several grounds. We affirm.

_____

[*] United States District Judge for the Eastern District of Texas, sitting by designation.

No. 22-10460

# I.

Su Mun purchased the HanGil Hotel in Dallas, Texas, sometime before 2018. The facility was formerly a nursing home, but Mun quickly converted it into a free-wheeling drug emporium, allowing dealers to use the hotel's rooms as "trap rooms" from which they sold a plethora of illegal narcotics 24 hours a day, seven days a week. These trap rooms were equipped with surveillance cameras, and individuals worked as armed guards. For his trouble, Mun charged the drug dealers a higher room rate.

The HanGil first appeared on law enforcement's radar in July 2018 following several overdose deaths there. After reading numerous Google reviews that confirmed the hotel's status as a drug market, law enforcement began investigating the HanGil. But surveillance proved difficult, as all the hotel's rooms faced an interior hallway. Flummoxed, law enforcement put up a "pole camera" near the hotel. The pole camera captured footage of people coming and going from the hotel day and night; the open-air use of narcotics; and individuals openly carrying firearms, including assault rifles. Throughout 2018, Dallas police officers conducted numerous code inspections of the HanGil, and each uncovered significant evidence of a large drug operation—despite Mun's warning his tenants of the inspections beforehand. The cat-and-mouse game only ended when Erick Freeman, a prolific HanGil drug dealer who had a penchant for violence—including use of a blowtorch to torture people—was arrested in early 2019 and cooperated with law enforcement.

Hill was involved in the HanGil's activities throughout most of the hotel's sordid history. At first, he worked for Mun as hotel security. Then, he operated a trap room selling cocaine base and heroin. But when Hill lost most of his customers due to his own addiction and the arrival of other

2

No. 22-10460

dealers, including Freeman, he began working for Freeman in several capacities.

As Freeman's enforcer, Hill, brandishing a firearm, stood guard at the entrance of Freeman's trap rooms. His job was to intimidate and coerce Freeman's customers and other people that Freeman believed owed him money. On one occasion, Hill and two others beat a homeless man until he was unconscious. On another, someone paid Hill $250 to remove a body from one of the trap rooms. In addition to his enforcer and doorman duties, Hill also cut, bagged, and sold drugs for Freeman, including heroin and cocaine base.

But Hill's behavior proved too abhorrent even for the HanGil. In the early morning hours of December 27, 2018, Hill was working the door of one of Freeman's trap rooms. Freeman's room surveillance camera captured the events. A customer, L.R., was using drugs provided by Hill. After L.R. smoked what appeared to be crack cocaine, she injected an unknown substance into her arm as Hill watched. As L.R. was falling in and out of consciousness, Hill put on gloves and took her into the bathroom of the trap room. The two were in the bathroom for 26 minutes. Another person working for Freeman testified that she heard people having sexual intercourse. When Hill exited the bathroom, he was still wearing gloves but neither his shirt nor his necklace. He threw his shirt into a trash can, put on his necklace, and made the sign of the cross. Freeman's other employee entered the bathroom and found L.R. unresponsive with her hair covering her face and her pants pulled down. Freeman subsequently investigated, and, determining that L.R. had died, recruited two individuals to help him dispose of her body. Freeman thereafter banished Hill from the HanGil.

After Freeman's arrest in 2019, law enforcement used the recorded surveillance footage of his trap rooms to build their case against the HanGil's

principals.  A series of indictments followed, with Hill being indicted on October 9, 2019.  After a superseding indictment that charged Hill with one count of conspiracy to possess with intent to distribute a controlled substance, Hill went to trial on April 7, 2021.  The jury deadlocked, and the district court declared a mistrial.  The Government responded with a three-count superseding indictment, charging Hill with conspiracy to possess with intent to distribute a controlled substance (count one), possession with intent to distribute a Schedule II controlled substance (count two), and distribution of a Schedule II controlled substance (count three).  After a seven-day trial, the second jury convicted Hill on counts one and three but acquitted him on count two.

Hill was sentenced under 21 U.S.C. § 841(b)(1)(A) for conspiracy to possess with intent to distribute a controlled substance, which, unlike its more lenient neighboring subsections, carries a sentence of 120 months to life.  § 841(b)(1)(A)(iii).  To obtain a conviction under § 841(b)(1)(A), the Government must show that the defendant *knew* that the conspiracy involved a minimum quantity of the controlled substance.  The threshold for heroin is one kilogram; for cocaine base, 280 grams.  § 841(b)(1)(A)(i) & (iii).  In Hill's case, the jury charge and verdict form—specifically, whether they facilitated a jury finding that Hill had knowledge of the drug quantities involved in the HanGil conspiracy—are at issue.

The jury charge given by the district court instructed the jury to convict if it found that Hill "knew that the scope of the conspiracy involved at least a detectable amount of heroin or at least 280 grams of a mixture or substance containing cocaine base."  The verdict form used special interrogatories for the jury to determine specific drug quantities involved in the conspiracy.  The first asked whether the "substance that was intended to be distributed as part of the conspiracy contained a detectable amount of cocaine base," and the jury checked "yes."  The next asked for the amount

of cocaine base, and the jury checked "280 grams or more." The last question asked whether the conspiracy included a detectable amount of heroin, and again the jury checked "yes." The jury was not specifically asked via the verdict form whether Hill knew the scope of the conspiracy envisioned these amounts.

Post verdict, Hill raised several objections to the presentence investigation report (PSR). Relevant here, he objected to the PSR's drug quantity determination. The PSR recommended that Hill be held accountable for one kilogram of cocaine base and one kilogram of heroin per month for nine months. The PSR did not explain how it arrived at that number, only stating the amounts were "consistent with what other codefendants were held accountable for through the case[.]" In fact, the PSR conceded that "[t]he specific quantities of narcotics being sold from each room in the HanGil Hotel [are] unknown[.]" The district court overruled Hill's objection, finding that the PSR's drug quantity determination was supported by "statements of several unindicted co-conspirators and co-defendants, former customers of [Hill's], criminal background checks, and evidence introduced at [Hill's] trial." Specifically, the court cited Hill's own statements in which he admitted to selling drugs at the HanGil and the trial testimony of other witnesses who testified as to the amount of drugs distributed each day.

Hill's total offense level was 44, reduced to the maximum level of 43 allowed by the Guidelines, and his criminal history category was III. *See* U.S.S.G., Ch. 5, Pt. A, cmt. (n.2). The result was a Guidelines range of life imprisonment. The district court varied downward, tracking the proposed EQUAL Act, then-pending legislation in Congress that would have eliminated the sentencing disparity between crack and powder cocaine. Thus, the court gave Hill the benefit of an unenacted law and sentenced him as if it applied. In the end, the district court sentenced Hill to 480 months on

the first count and 240 months on the second count, to run concurrently. Hill timely appealed.

## II.

Hill raises four issues on appeal. He contends that (A) the district court imposed a "trial penalty" in sentencing him, i.e, the court sentenced Hill more harshly than it otherwise would have because he went to trial. Hill also argues that (B) the district court erred in determining the quantity of drugs attributable to him, and he challenges (C) the propriety of the jury charge and verdict form. Finally, Hill asserts that (D) the district court imposed a substantively unreasonable sentence. Reviewing these arguments in turn, we find each to be without merit.

## A.

Hill asserts that the district court sentenced him more harshly because he went to trial, thereby imposing a trial penalty. The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. "[A] defendant cannot be punished by a more severe sentence because he unsuccessfully exercises his constitutional right to stand trial." *United States v. Gozes-Wagner*, 977 F.3d 323, 335 (5th Cir. 2020) (citation and quotation marks omitted). A defendant can show a trial penalty in two ways: (1) by comparison to the sentences of "similarly situated" defendants, or (2) by the district court's "plain[] state[ment] that it was punishing the defendant more severely than it otherwise would *because* she went to trial[.]" *Id.* at 337 (citation omitted). In assessing the question, though, we remain mindful that the "bargained-for leniency inherent in the plea negotiation process is not available once a trial has been held[.]" *United States v. Velasquez*, 881 F.3d 314, 343 (5th Cir. 2018) (citation and quotation marks omitted).

We have previously utilized two standards of review for trial penalty claims.  In one unpublished case, we applied *de novo* review.  *See United States v. Molina*, No. 20-11232, 2022 WL 3971588, at \*4–5 (5th Cir. Aug. 31, 2022), *cert. denied*, 143 S. Ct. 619 (2023).  But in another, we reviewed the sentence for plain error.  *See United States v. Guy*, 633 F. App'x 851, 855 (5th Cir. 2015), *as revised* (Dec. 15, 2015).  In any event, we need not pick the correct standard today because Hill's claim fails under even *de novo* review.  *See Gozes-Wagner*, 977 F.3d at 335 n.7 (similar).

Hill argues that the district court explicitly stated that it was sentencing him more harshly because he went to trial, thus imposing a trial penalty.  He points to two comments from his sentencing, one by the Government and another by the district court.  Arguing that Hill deserved life in prison, counsel for the Government stated:

> [O]f all the defendants in this case . . . the only defendant that did not . . . provide the Government with some assistance to stop this madness was [Hill].  That's why Mr. Freeman is not in prison for the rest his life, that is why Mr. Washington is not in prison for the rest of his life.  Yes, they engaged in some horrific acts, they were involved in this conspiracy, they were high up in the food chain, but when they were caught, they stepped up, they helped find [L.R.'s] body, they cooperated and help[ed] identify all the other individuals that were involved in this case.  This Defendant chose not to.  That's his right.  That is absolutely his right to put the Government to the test to come in here and prove its case.  We did.

And in relevant part, the district court explained that it "agree[d] with the Government's counsel that as heinous as the crimes by Messrs. Freeman and Washington were, it's a very different situation there than here.  They accepted responsibility.  They were both [Rule] 11(c)(1)(C) agreements [sic] and so on."  Hill contends that these statements, considered together,

indicate that both the Government and district court relied on Hill's not pleading guilty, i.e., his going to trial, to justify a significantly higher sentence than his co-conspirators, Freeman and Washington, who both received 360 months.

We disagree. The statements made by the Government at sentencing are only relevant insofar as they inform the meaning of the district court's statements. And the district court's statements during Hill's sentencing must be viewed in context. *See Gozes-Wagner*, 977 F.3d at 340 n.12 ("One stray comment does not create error when it can be understood in the context of a lengthy sentencing hearing."). The district court's comments came during its discussion of the 18 U.S.C. § 3553(a) sentencing factors. Specifically, the court mentioned the need to avoid unwarranted sentencing disparities among defendants before making the challenged statement. It is thus reasonable to assume that the district court sought to distinguish Freeman and Washington as not similarly situated for purposes of 18 U.S.C. § 3553(a)(6). *See United States v. Duhon*, 541 F.3d 391, 397 (5th Cir. 2008) (stating that a "[d]isparity in sentences between a defendant who provided substantial assistance and one who provided no assistance . . . is not unwarranted" (citation and quotation marks omitted)).

Further, we do not read the district court's recognition that Freeman and Washington "accepted responsibility" as centering on their forfeiture of their right to jury trial. Rather, we read that statement as indicative of Freeman's and Washington's cooperation with the Government, especially considering the district court's recognition that their plea agreements were reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), which

indicates some level of cooperation.[1]   Moreover, during its extended explanation of Hill's sentence, the district court listed various reasons for the sentence it was imposing—which incorporated a downward variance—including Hill's involvement in the conspiracy from start to finish, his violent behavior, and his sexual assault of an incapacitated victim.

Finally, the district court considered that Freeman and Washington were inapt comparators because they cooperated with the Government. "[A] defendant who cooperates with the Government is not similarly situated to one who refuses to do so." *Gozes-Wagner*, 977 F.3d at 337 (citation omitted).  "We cannot compare apples to oranges when deciding whether a sentence is 'more severe' for trial penalty purposes." *Id.* Based on the record before us, we conclude that the district court did not make any statement, plain or otherwise, that it was sentencing Hill more harshly because he went to trial.  And Washington and Freeman were not "similarly situated" to Hill, so their sentences are irrelevant.  We discern no reversible error as to this issue.

## B.

Hill next argues that the district court erred in calculating the drug quantity attributable to him.  We disagree.

A participant in a drug conspiracy is responsible for all drug quantities with which he was "directly involved," as well as for quantities "involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal

---

[1] The hearing transcript states that the plea agreements were made under Rule 11(c)(1)(C).  But the Government clarified in its briefing that Freeman's and Washington's plea agreements were struck pursuant to Rule 11(c)(1)(B).

activity." U.S.S.G. § 1B1.3, cmt. (n.3(D)); *see United States v. Johnson*, 14 F.4th 342, 347 (5th Cir. 2021). We review the district court's drug quantity determination for clear error. *See United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009).

> In calculating the drug quantity attributable to Hill, the PSR provided:
>
> The specific quantities of narcotics being sold from each room in the HanGil Hotel [are] unknown, which is primarily a result of the difficulty in investigating this case . . . . However, because no other way to calculate drug quantities is available, and to remain consistent with what other codefendants were held accountable for through the case, the defendant will be held accountable for 1 kilogram of heroin and 1 kilogram of cocaine base (crack) for each month Hill was involved in the conspiracy.

Hill attacks these statements as unsupported, and thus insufficiently reliable to support the district court's ultimate drug quantity attribution. So he argues we should remand for resentencing.

A PSR generally "bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual findings." *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (citations omitted). "However, mere inclusion in the PSR does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing." *United States v. Gentry*, 941 F.3d 767, 788 (5th Cir. 2019) (internal quotation marks and citation omitted). "Bald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR." *Harris*, 702 F.3d at 230 n.2 (citation and quotation marks omitted). "If the factual recitation in the PSR lacks sufficient indicia of reliability, then it is error for the district court to consider it at sentencing—regardless of whether the defendant objects or offers

rebuttal evidence." *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) (cleaned up).

Hill might be correct that the PSR, viewed in isolation, does not contain facts carrying sufficient indicia of reliability to substantiate the drug quantity determination. However, "[w]hen making factual findings for sentencing purposes, a district court may consider any information which bears sufficient indicia of reliability to support its probable accuracy." *Id.* at 590 (citation and quotation marks omitted). Here, the district court "[found] that the facts in the PSR [were] supported by statements of several unindicted co-conspirators and co-defendants, former customers of [Hill's], criminal background checks, and evidence introduced at [Hill's] trial." Specifically, the court cited Hill's prior statements, in which he admitted to selling drugs at the HanGil, and the trial testimony of other witnesses, including Kimberly Robinson, who, like Hill, bagged and sold drugs for Freeman. Robinson detailed the quantity of drugs distributed each day.[2]

---

[2] Robinson testified that she routinely sold at least two to three 25-gram "cookies" of crack cocaine during a 12-hour shift, from just one of Freeman's trap rooms. She also testified that she sold "lots" of heroin, which was sold in 3.1-gram quantities for $125 each, and could make as much as $3,000 during a good 12-hour shift. Working two or three shifts a week, Robinson thus personally sold at least 100, and maybe over 200, grams of crack cocaine during a week. Conservatively extrapolating, if approximately 100 grams of crack cocaine were sold daily in this one trap room, well more than 1000 grams of crack cocaine would plausibly have been sold from Freeman's trap rooms each month. Based on Robinson's testimony alone, the PSR's estimate was if anything *conservative* in its calculations.

Similarly, Monica Saucedo testified that, as a bagger for Freeman, she sold approximately $2,000 of heroin and five or six 14-gram "cookies" of crack cocaine (70 grams, on the low end) every day for Freeman. Assuming that 3.1-gram quantities of heroin sold for $125, then Saucedo sold approximately 50 grams of heroin daily. Thus, well more than one kilogram of heroin was sold monthly out of one of Freeman's trap rooms, before adding the quantity sold by Hill himself. As with the cocaine estimate, the PSR's heroin quantity calculation was, if anything, skewed in Hill's favor.

No. 22-10460

Considering this evidence, the court concluded that "the drug quantities in the PSR [are] supported by a preponderance of the evidence."

The district court's reliance on evidence not expressly cited in the PSR was consistent with our caselaw, *see Zuniga*, 720 F.3d at 590, and the evidence provided an adequate basis for the PSR's ultimate drug quantity calculations, which the district court expressly found was calculated "to the benefit of [Hill]." Notably, Hill also fails to rebut the evidence. The district court's determination of the quantity of drugs attributable to Hill was not clearly erroneous.

## C.

Hill challenges the propriety of the jury charge and verdict form as to count one, which charged Hill with conspiracy to possess 280 grams or more of a mixture containing a detectable amount of cocaine base with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). As noted *supra* in Part I, when the Government seeks an enhanced sentence under § 841(b)(1)(A), the jury must "determine the [drug] amount which each defendant knew or should have known was involved in the conspiracy." *United States v. Montemayor*, 55 F.4th 1003, 1012 (5th Cir. 2022) (citation and quotation marks omitted). A district court therefore errs if it imposes a mandatory minimum under § 841(b)(1)(A) based on a jury finding of the drug quantity attributable to the entire conspiracy, as opposed to the amount of drugs the particular defendant knew, or should have known, was involved. *United States v. Haines*, 803 F.3d 713, 741–42 (5th Cir. 2015).

Hill contends that the jury charge and verdict form did not require the jury to find that he knew that the scope of the conspiracy included 280 grams of cocaine base. The jury charge on this element instructed the jury to determine whether Hill "knew that the scope of the conspiracy involved at least a detectable amount of heroin *or* at least 280 grams of a mixture or

12

substance containing cocaine base." (emphasis added). Thus, though the charge contained the requisite scienter, it was written in the disjunctive, allowing for conviction under *either* a cocaine base or heroin theory of guilt.

According to Hill, because the verdict form did not include a special interrogatory centered on his knowledge of the amount of cocaine base involved in the conspiracy, the jury did not find that he had such knowledge. Therefore, the Government failed to prove the required § 841(b)(1)(A) elements, and Hill should not be subject to the mandatory minimum under that subsection. Instead, the jury could only have convicted him of violating § 841(b)(1)(C), which carries a statutory *maximum* of 240 months, such that his 480-month sentence under count one must be set aside.

Hill did not object to the jury charge or verdict form at trial. Ordinarily, failure to abide by the contemporaneous objection rule "precludes the raising on appeal of the unpreserved claim of trial error." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation omitted). But Federal Rule of Criminal Procedure 52(b) "recognizes a limited exception to that preclusion," in that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." *Id.* (quoting Fed. R. Crim. P. 52(b)).

"To establish plain error, 'a defendant must show (1) error, (2) that is clear or obvious, and (3) that affected the defendant's substantial rights.'" *Montemayor*, 55 F.4th at 1010 (quoting *United States v. Hinojosa*, 749 F.3d 407, 411 (5th Cir. 2014)). If the first three prongs are satisfied, then the court has the discretion to "remedy the error only if it (4) seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and quotation marks omitted). "Meeting all four prongs is difficult, as it should be." *Puckett*, 556 U.S. at 135 (quotation marks and citation omitted). And the Supreme Court has "repeatedly cautioned that [a]ny unwarranted

extension of the authority granted by Rule 52(b) would disturb the careful balance it strikes between judicial efficiency and the redress of injustice[.]" *Id.* (quotation marks and citation omitted).

We assume *arguendo* that there was clear or obvious error in the jury charge and corresponding verdict form, though whether there actually was plain error is at least debatable. The jury charge conformed to our pattern jury instructions, *see* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 2.97 (2019), but contained two distinct theories of guilt (cocaine and heroin). Any uncertainty caused by the "or" in the jury charge is somewhat ameliorated by the verdict form's special interrogatories, because from them, we know that the jury convicted Hill of conspiracy to possess with intent to distribute and found that the conspiracy involved at least 280 grams of cocaine base. Nevertheless, we are left with the lack of an express finding that *Hill knew* that the conspiracy involved at least 280 grams of cocaine base, even if that is implied in the jury's responses. *See Montemayor*, 55 F.4th at 1012–14; *see also United States v. Benitez*, 809 F.3d 243, 250 (5th Cir. 2015) (holding that the jury must find individualized drug weight and a failure to do so "satisfies the first two prongs of the plain error analysis"); *cf. United States v. Gonzales*, 841 F.3d 339, 346 (5th Cir. 2016) ("With respect to special interrogatories, we have repeated the refrain that they should not be used in criminal trials." (cleaned up)).

More clearly, any error that occurred affected Hill's substantial rights. This prong of the analysis "may be satisfied by showing a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Montemayor*, 55 F.4th at 1010 (citation and quotation marks omitted). If Hill had not been convicted under § 841(b)(1)(A), then the maximum sentence he faced for count one would have been 240 months, half of the 480 months he received. *See* 21 U.S.C. § 841(b)(1)(C). Simply put,

there is a reasonable probability that, but for the error, Hill would have received a significantly shorter sentence. *See Montemayor*, 55 F.4th at 1013.

But even if Hill establishes the first three prongs of plain error, he falters on the fourth. To succeed on plain error review, the error must "seriously affect[] the fairness, integrity[,] or public reputation of judicial proceedings." *Id.* (citation omitted). Only then may we exercise our discretion to remedy the error. *See id.* at 1010, 1013. In *Montemayor*, we weighed whether to do so faced with a similar scenario, i.e., when the jury had not made the requisite individualized drug finding. *Id.* at 1012–14. We held that, notwithstanding clear error that affected their substantial rights, the evidence against the defendants was "overwhelming," so that the error did not satisfy the fourth prong. *Id.* at 1014. We reach the same conclusion in Hill's case.

There was overwhelming evidence that Hill "knew or should have known [the drug amount that] was involved in the conspiracy[.]" *Haines*, 803 F.3d at 741; *see also Montemayor*, 55 F.4th at 1014. Besides operating his own trap room selling cocaine base, he also served as hotel security for Mun and as an enforcer and bagger for Freeman. He served in these varied roles from the time Mun bought the HanGil until late 2018. During his tenure providing security, Hill would have been privy to each of the trap rooms and known that cocaine base was being sold. And when working for Freeman, Hill bagged cocaine base and facilitated its distribution while hundreds of grams of cocaine base were sold out of Freeman's trap rooms. *See supra* n.2. Based on Hill's personal involvement in the broader HanGil enterprise, his personal drug dealing, and his work for Freeman, it is inconceivable that he did not know that the conspiracy involved at least 280 grams of cocaine base. Thus, regardless if there was plain error in the jury charge and verdict form, Hill has "not shown that the fairness, integrity, or public reputation of the judicial proceedings was seriously affected." *Monetmayor*, 55 F.4th at 1014.

### D.

Finally, Hill asserts that the district court imposed a substantively unreasonable sentence. Our review for substantive reasonableness "is highly deferential[] because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors[.]" *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015) (citation and quotation marks omitted). A sentence below the Guidelines range enjoys a presumption of reasonableness. *United States v. Scully*, 951 F.3d 656, 672 (5th Cir. 2020).

The Guidelines range calculated for Hill's sentence was life imprisonment. But the district court varied downward from the Guidelines range, using the base offense level that would have applied under the unenacted EQUAL Act to determine what the hypothetical range would be. By sentencing Hill to 480 months, the district court thus gave Hill the benefit of *proposed legislation* via a downward departure from the actual Guidelines range. So the presumption of reasonableness most certainly applies here.

Hill can rebut this presumption "only upon a showing that the sentence does not account for a [sentencing] factor that should receive significant weight, it gives significant weight to an irrelevant or improper [sentencing] factor, or it represents a clear error of judgment in balancing sentencing factors." *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009) (citation omitted). Hill argues that the district court did not account for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Specifically, he points out that Mun, who owned the HanGil hotel, only received 240 months; Freeman, the leader of the drug conspiracy who tortured people with a blowtorch, only received 360 months; and Washington, one of Freeman's enforcers who helped Freeman torture someone, only received 360 months. Hill argues that his 480-month

sentence creates an unwarranted disparity because he had a comparatively minor role in the conspiracy and never tortured anyone.

Hill fails to rebut the presumption that his sentence was substantively reasonable. For the same reasons as described *supra* in Part II.A., he was not similarly situated to the other defendants. He did not plead guilty, and he did not cooperate with the Government. *See Duhon*, 541 F.3d at 397 (stating that a "[d]isparity in sentences between a defendant who provided substantial assistance and one who provided no assistance . . . is not unwarranted" (citation and quotation marks omitted)). The district court also expressly considered the need to avoid unwarranted sentencing disparities among defendants, but distinguished Hill from Freeman and Washington based on their cooperation with the Government. We discern no abuse of discretion in the district court's sentencing Hill, and this claim lacks merit.

## III.

Each of Hill's four challenges to his sentence fails. The judgment of the district court is therefore

AFFIRMED.