# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-20157

United States Court of Appeals
Fifth Circuit

**FILED**
September 28, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

DANIELA GOZES-WAGNER, also known as Daniela Wagner, also known as Daniela Mayer Gozes, also known as Daniela Gozes,

> Defendant - Appellant

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before STEWART, DENNIS, and HAYNES, Circuit Judges.

CARL E. STEWART, Circuit Judge:

A jury convicted Daniela Gozes-Wagner of conspiracy to commit health care fraud and conspiracy to commit money laundering. The district court sentenced her to 120 months (10 years) imprisonment on each count, with the sentences running consecutively, for a total of 240 months (20 years). The court also ordered her to pay more than $15 million in restitution.

On appeal, Gozes-Wagner argues that her sentence should be vacated because it was the result of an unconstitutional "trial penalty"—a punishment for choosing to exercise her right to stand trial instead of pleading guilty. She also argues that her sentence should be vacated because it was both

No. 19-20157

procedurally and substantively unreasonable. Finally, she seeks vacatur of the restitution award on several grounds. Finding no reversible error, we affirm.

## I. Background

### A. *The Conspiracy*

Daniela Gozes-Wagner worked as a mid-level manager for a Russian-led conglomerate that stole millions from Medicare and Medicaid. Her role in the conspiracy included, among other things: recruiting doctors to approve unnecessary medical tests, hiring "seat warmers" to sit in empty offices designated as fronts for shell companies that she helped manage to cover up the scheme, and overseeing payroll operations for "testing facilities" in the Houston area. Other members of the conspiracy relevant to this appeal include: Aliksander Beketav, Mikhail Shiforenko, Alexsandr Voronov, and Boris Robert Brodsky.

In 2014, a grand jury returned a two-count indictment against Beketav, Shiforenko, Voronov, and Gozes-Wagner. All four were charged with one count of conspiracy to commit health care fraud. The Russians—but not Gozes-Wagner—also were charged with one count of conspiracy to commit money laundering. Later on, Brodsky was charged in a single-count superseding information with conspiracy to commit health care fraud. Initially, then, Gozes-Wagner and Brodsky each faced only a conspiracy to commit health care fraud charge, while Beketav, Shiforenko, and Voronov each faced both a conspiracy to commit health care fraud charge and a conspiracy to commit money laundering charge.

Slowly but surely, circumstances changed. Soon after being arrested in 2015, Beketav attempted to hang himself and became incapacitated. In July 2016, Voronov pleaded guilty without a plea agreement to a superseding information charging him with a single count of conspiracy to commit health

No. 19-20157

care fraud. The conviction carried a maximum sentence of 60 months in prison. Meanwhile, Shiforenko had been cooperating with the Government. In December 2016, he agreed to plead guilty to the conspiracy to commit health care fraud charge in exchange for the Government agreeing to dismiss the conspiracy to commit money laundering charge. This meant that he now faced a statutory maximum sentence of 120 months. At this point, of the originally indicted conspirators, Gozes-Wagner was the only one who might go to trial.

In March 2017, a grand jury returned a superseding two-count indictment against Gozes-Wagner. This time, she was charged with two counts: conspiracy to commit health care fraud charge *and* conspiracy to commit money laundering. Shortly thereafter, the district court granted the Government's request to dismiss the charges against Beketav because of his incapacitation. And in August 2017, Brodsky pleaded guilty to the single count of conspiracy to commit health care fraud that he faced. Brodsky's conviction carried a statutory maximum sentence of 60 months.

It was then the case that none of Gozes-Wagner's co-conspirators would be sentenced to more than 120 months in prison. Gozes-Wagner, meanwhile, faced a combined statutory maximum of 360 months imprisonment: 120 months for a conviction of conspiracy to commit health fraud under 18 U.S.C. § 1347, and 240 months for a conviction of conspiracy to commit money laundering under 18 U.S.C. § 1956(a)(1). This 360-month maximum sentence was three times Shiforenko's 120-month maximum sentence and six times Voronov and Brodsky's 60-month maximum sentences.

It bears mentioning here that Judge Melissa Harmon had presided over the conspirators' cases until this point and had taken the guilty pleas of Brodsky, Voronov, and Shiforenko. But just days before Gozes-Wagner's trial was set to begin, her case was transferred to Judge David Hittner. Trial began

3

No. 19-20157

before Judge Hittner on September 25, 2017. It ended several days later when the jury convicted Gozes-Wagner on both counts she faced.

In July 2018, before anyone in the conspiracy had been sentenced, the conspirators' cases were reassigned to Judge Andrew Hanen. A few months later, in October 2018, Gozes-Wagner's case was transferred *back* to Judge Hittner for sentencing. Shiforenko's, Voronov's, and Brodsky's cases remained before Judge Hanen. Our references to "the district court" throughout this opinion are to Judge Hittner.

Gozes-Wagner was the first conspirator to be sentenced. Her sentencing hearing was held on March 6, 2019. The table below illustrates the relative positions of the co-conspirators at the time Gozes-Wagner was sentenced.

| Conspirator | Role | Counts | Disposition of charges | Max Sentence |
|---|---|---|---|---|
| Beketav | Leader | HCF[1] & ML[2] | Dismissed | N/A |
| Shiforenko | Chief assistant | HCF[3] | Plea agmt | 10 yrs |
| Voronov | Manager | HCF | Plea (no agmt) | 5 yrs |

---

[1] "HCF" is short for conspiracy to commit health care fraud. Even though Voronov initially was charged under 18 U.S.C. § 1347, which carries a 10-year statutory maximum sentence, the charge he pleaded to in the superseding information was under 18 U.S.C. § 371, which carries a 5-year statutory maximum sentence. Brodsky was initially charged under § 371, and he pleaded guilty under that statute. Shiforenko, meanwhile, pleaded to the more serious charge in the initial indictment under § 1347, and Gozes-Wagner was convicted under § 1347, too. This explains why Voronov and Brodsky faced 5-year statutory maximum sentences for conspiracy to commit health care fraud while Shiforenko and Gozes-Wagner faced 10-year statutory maximum sentences for similar, but distinct, convictions.

[2] "ML" is short for conspiracy to commit money laundering.

[3] Although Shiforenko was initially charged with conspiracy to commit health care fraud and conspiracy to commit money laundering, the table only includes the conspiracy to commit health care fraud charge because that's the only one upon which he was convicted.

4

No. 19-20157

| Brodsky | Manager | HCF | Plea agmt | 5 yrs |
|---|---|---|---|---|
| Gozes-Wagner | Manager | HCF & ML | Convicted by jury | 30 yrs |

The PSR calculated Gozes-Wagner's Guidelines range as 324 to 360 months (27 to 30 years).[4] Probation recommended a sentence of 324 months, the low end of the Guidelines. Gozes-Wagner sought a significant downward variance. The Government's position was unclear. The prosecutor first requested that she be sentenced at "the low end of the guidelines." When reminded by Judge Hittner that such a sentence would amount to at least 27 years, the prosecutor said, apparently in error, that such a sentence "would be above the sentencing max." As such, he asked "for 240 months [20 years]," which he said amounted to "the sentencing max . . . under the guidelines."

Gozes-Wagner emphasized that she faced a much lengthier sentence than her pleading co-conspirators. She argued that because Shiforenko faced only a 120-month maximum sentence and Voronov and Brodsky faced only 60-month maximum sentences, it would be unfair and illegal to sentence her, as she is arguably not as culpable as them, to anything close to the Guidelines range of 324 to 360 months.

The district court listened to Gozes-Wagner's arguments and then pronounced its sentence. Consistent with the Government's final request, it sentenced her to 240 total months imprisonment: 120 months on each count of conviction, to run consecutively. The 20-year sentence amounted to a 7-year downward variance from the low end of her Guidelines range. Gozes-Wagner also was ordered to pay $15,283,985 in restitution.

But it is *how* the court reached its sentence that is primarily at issue in this appeal. To more fully appreciate the context in which the sentencing

---

[4] Although Gozes-Wagner challenged the calculation of the Guidelines range in the district court, she does not do so on appeal.

occurred, we will begin by examining what transpired during trial. We will then closely inspect the sentencing hearing itself.

## B. The Trial

The Government presented its case-in-chief through the testimony of fourteen witnesses over three days. Its first witness was Agent William Marlowe, a task force officer with the FBI in Houston. Agent Marlowe testified that the investigation into the Beketav Group began in 2009 with "notice that patients were receiving monies in return for medical services." Suspicious findings appeared almost immediately. Although billing records described patients as being seen at specific offices, follow-up interviews with those same patients confirmed that they had in fact been seen at their houses. Then there was the "cyclical billing," where a patient would receive "a battery of diagnostic tests" one month followed by the same tests several months later. The investigative trail led agents to the Beketav Group, Agent Marlowe testified.

Agent Marlowe explained that Gozes-Wagner's initial role in the conspiracy was as "a marketer or recruiter," but her duties grew. On more than one occasion, when he visited locations believed to be operated by the group, she was the person who appeared to be in charge.

The Government then called Sandra Garcia as its second witness. She told the jury that Gozes-Wagner hired her as a medical assistant in 2014. Garcia testified that Gozes-Wagner instructed her to review medical files and find patients who complained of neuropathy, or numbness, and then contact them after 30 or 60 days to see if they needed more tests. The practice made Garcia uncomfortable because it seemed to be designed to evade Medicare scrutiny, she testified. Garcia soon discovered what appeared to her to be outright fraud: reimbursements for MRI tests that could not have possibly been done because her employer did not have an MRI machine. When she confronted Gozes-Wagner about the issue, Gozes-Wagner told her it must have been an

accident. When Garcia raised the issue a second time, she was told she was being fired.

Then, to her surprise, she wasn't fired. Instead, Gozes-Wagner told her that for $10 an hour all she had to do was sit in an empty office and, in Garcia's words, "watch Netflix all day long." Garcia's primary duty was to wait for the phone to ring. If it was Medicare calling, she was instructed by Gozes-Wagner to say that "the doctor is not in the office at the moment" and that she'd call them back. In sum, Garcia testified that she took direction from Gozes-Wagner to help perpetuate what she believed to be a Medicare fraud scheme. A handful of other witnesses told stories similar to Garcia's.

Three FBI special agents testified. Special Agent Kevin Lammons testified, among other things, that he found medical forms in some of the offices operated by the Beketav Group that had been signed by a doctor and had requested a specific test for a patient even though there were blank spaces on the forms where the patient's name and information were supposed to appear. In other words, the forms were "pre-signed" before a patient had ever been seen. Special Agent Paul Nixon, who oversaw the execution of the search warrant in February 2015 at the office where Gozes-Wagner worked, also described finding pre-signed forms by at least half a dozen doctors. One particular document suggested it was Gozes-Wagner's idea to defraud Medicare by over-billing for allergy tests, Nixon testified. Finally, Special Agent Tiffany Smith testified that she found keys to various offices while searching Gozes-Wagner's desk, suggesting she had an important role in the Beketav Group.

Also testifying for the Government were Monica Roberts and Kathleen Anderson. Roberts, a Special Agent with the Department of Health and Human Service's Office of Inspector General, described documents seized from Gozes-Wagner's desk that implicated her in the fraud. Anderson, a forensic

accountant with the FBI, traced the illicit profits from the conspiracy to the bank accounts of the conspiracy's main players, including Gozes-Wagner. In particular, Anderson's testimony showed that Gozes-Wagner's haul increased every year from 2010 through 2014, suggesting her value to the conspiracy grew with it.

The Government's final two witnesses were Dr. Jack McCoy and Donna Large. Dr. McCoy, a certified fraud examiner, served as an FBI source in the agency's investigation into the Beketav Group. Dr. McCoy testified that based on his experience at one clinic, it was evident that fraud was occurring. Large, a registered nurse who investigated the fraud for Medicare, agreed. She highlighted all of the red flags apparent from the billing practices employed by the Beketav Group. There were many.

When the Government rested, Gozes-Wagner moved for acquittal. The district court denied her request. Gozes-Wagner then put on six witnesses of her own: her mother, her roommate, her rabbi, and several other friends of hers. Their testimony was materially indistinguishable: Gozes-Wagner had a reputation in the community for being honest, trustworthy, and a law-abiding citizen. When she rested her case, she again moved for acquittal, and the court again denied her request.

The jury deliberated for about three hours. It found her guilty of both conspiracy to commit healthcare fraud and conspiracy to commit money laundering.

## C. The Sentencing Hearing

About a year-and-a-half passed between Gozes-Wagner's conviction and her sentencing hearing. On March 6, 2019, the court began the hearing by stating, "All right. We're here for sentencing in this case. The defendant, she was the only defendant to plead not guilty, I believe; is that correct, Counsel?" This was the first of several instances in which the district court noted Gozes-

No. 19-20157

Wagner's decision to go to trial during the hearing. These references lie at the core of the constitutional, procedural, and substantive challenges to Gozes-Wagner's sentence.

The district court then began to discuss Gozes-Wagner's numerous objections to the PSR. After addressing the first three, the following exchange occurred between the court and the prosecutor:

> [THE COURT:] Now, my understanding is the other defendants pled guilty; is that correct, Counsel?
>
> MR. CHU [the prosecutor]: Yes, Your Honor.
>
> THE COURT: They are before another judge, correct?
>
> MR. CHU: Yes, Your Honor.
>
> THE COURT: And the cap on that is ten years, right?
>
> MR. CHU: Yes, Your Honor.[5]
>
> THE COURT: Even the guidelines might be extremely high, even higher than this defendant, correct?
>
> MR. CHU: Yes, Your Honor.
>
> THE COURT: They are capped the max because they pled to one count. And here there are two counts. By the way, I want the record to reflect any defendant has an absolute right to plead not guilty in federal or state court. It's an absolute right. It's not meant as any kind of a criticism either to the government or to the system.

This marked the second time that the district court noted Gozes-Wagner's decision to go to trial during the sentencing hearing.

The court then discussed the many remaining objections, granting some and overruling others. Shortly thereafter, the court noted during a discussion about Gozes-Wagner's attempt to cooperate with the Government: "I mean, the

---

[5] The prosecutor's response was incorrect. Although Shiforenko's maximum sentence was ten years (120 months), Voronov's and Brodsky's maximum sentences were five years (60 months).

government didn't file a downward departure because she — you know, your client pled not guilty, which was her absolute right." This was the third time the court referenced Gozes-Wagner's decision to go to trial.

Just before the court allowed Gozes-Wagner's counsel to begin arguing for a below-Guidelines sentence, the court commented on the dozens of character letters it received on behalf of the defendant. The court stated:

> THE COURT: I have read all of this. I will say, as far as the letters go, they were correctly drafted, every single one. I read 81 of them.[6] All of them just went to your client's background, not that she was actually not guilty or didn't mean to do it or whatever. And that's unusual. I mean, they were carefully crafted. I don't mean that as a negative. I mean that as a positive. I read them all.

Finally, the hearing proceeded to arguments. Gozes-Wagner's counsel began by recognizing that Gozes-Wagner faced a possible sentence that was "humbling, if not outright frightening." The court responded by accurately describing the Guidelines range and commenting that it was "a high-end case." A little while later, Gozes-Wagner's counsel argued that his client was "not a bad human being" and that he "really believe[d]" that she was "not somebody we should be afraid of." To this, the court responded: "What about the havoc, the havoc that is wreaked by operations like this on our healthcare system, on Medicare, and Medicaid . . . ."

After discussing a few more issues, Gozes-Wagner's counsel moved on to his "sentencing disparity" argument. This led to the following exchange:

> MR. DUPONT [Gozes-Wagner's trial counsel]: I supplied the Court with [the co-conspirators'] sentencing situations. Mr. Shiforenko is facing a ten-

---

[6] Gozes-Wagner's counsel later noted that eighty-seven, not eighty-one, letters were filed on her behalf. The court responded: "Well, I'm just saying I read them all."

No. 19-20157

year cap, and the Court acknowledged that. But Mr. Brodsky and Mr. Voronov are facing five-year caps.

THE COURT: That's what they pled to, right? They pled guilty, correct?

MR. DUPONT: Well, with help from the government.

THE COURT: I'm just saying they pled guilty. That was their option. Once again, all I want to do is try cases. So I'm not saying anyone has waxed the right to a jury trial because I'll give them a jury trial. But that was their option. They pled guilty, and they accepted because their guidelines may be higher than this, which the guidelines in this case is up to 30 years with no parole. So, yeah. So they must have pled, what, to two five-year counts and another one to a ten-year count.

MR. DUPONT: One pled to a new complaint, and the other pled to a plea agreement.

THE COURT: Well, we are not — I'm not the charging authority.

MR. DUPONT: I understand. I say that to say, Your Honor, sentencing disparity is going to be one of the main themes I'm coming to Your Honor with today.

THE COURT: Well, with sentencing disparities — because I hear this a lot. Sentencing disparities, that basically means everybody on the same footing, correct, and it doesn't take into account, I don't believe, guilty pleas with a plea agreement with the government.

This was the fourth time the district court referenced Gozes-Wagner's decision to go to trial compared to her co-conspirators' decisions to plead guilty. But it was the first time the court made such a reference when directly responding to the sentencing disparity argument raised by Gozes-Wagner's counsel.

Shortly thereafter, when Gozes-Wagner's counsel referred to her as a "marginal participant[]" in the conspiracy, the court interrupted and stated:

11

No. 19-20157

"But she didn't get a marginal role." After a short back-and-forth, Gozes-Wagner's counsel continued:

> MR. DUPONT: Okay, Your Honor. I say that to say if we're going to put it up on a chalkboard to understand it, Shiforenko, who gained $1.19 million, is looking at ten years. Voronov, who got $973,000, is looking at five years. Brodsky, $1.4 million, he is looking at five years. And it's undisputed the evidence that was introduced before you in trial, Your Honor, she made $385,000 over five years. If we break that down to averages, Your Honor, that means about $5,000 a month, $1,300 a week, and maybe $32 an hour.
>
> THE COURT: But again, bottom line, Counsel, she exercised the constitutional rights that she has in the United States to plead not guilty.

This marked the fifth and final time the district court referenced Gozes-Wagner's decision to go to trial during the sentencing hearing.

After a discussion about the proper amount of restitution, Gozes-Wagner's counsel argued that there were "legitimate personal reasons and reasons about this young lady's life" that warranted a downward variance. The court identified the "reasons" as "children's concerns and health concerns."

The "children's concerns" were a reference to the fact that Gozes-Wagner was, prior to her arrest, the primary caretaker of her two minor children, a son and a daughter. At the time of her sentencing, her son was a teenager, and her daughter was eleven years old. The "health concerns" were, among other things: vitiligo, described in the record as "a long-term skin condition characterized by patches of skin losing its pigment;" a lymph node cyst; the fact that she only had one kidney "due to a genetic condition that simultaneously affects her heart and joints (similar to Marfan's syndrome);" hypothyroidism; a Vitamin D deficiency; and poor eyesight.

After Gozes-Wagner's counsel read aloud to the court a letter written by her daughter, he asked that she be sentenced to time served. In the alternative,

he asked for a sentence between thirty-one and forty-four months. Finally, if those two options were rejected, he requested that she be sentenced to sixty months, in line with the statutory maximums faced by Voronov and Brodsky.

When it came time for the prosecutor to speak, he described how health care fraud is "sucking away money from the people that need it." He also noted that it was misleading to compare Gozes-Wagner to Brodsky because his participation in the conspiracy ended in 2012, whereas hers continued until her arrest in 2015. The prosecutor did not mention Shiforenko or Voronov. He concluded by asking for the 240-month sentence that was erroneously described as the "sentencing maximum."

Having heard arguments from counsel, the court proceeded to pronounce its sentence.

> THE COURT: I do want to state that I have read this entire file and that right now the defendant could be facing up to 360 months. There is no parole in federal court. Parole was done away with at the — in 1987. We don't even have a parole commission. So nobody gets out on parole. The most they can get is 54 days a year good time after the first year.
>
> I will say this, whether I agree with the defendant or not, I'm going to read from my own notes. I don't lean off what the government says. I don't lean off what the government says or the defense says. But if I read, I'm reading from the notes I have, and it sounds — if it sounds somewhat familiar to either one, I can assure everybody here I'm not leaning, taking the government's word for it or the defendant's word for it. It is what I thought on my own.
>
> Under the guidelines — and a judge needs to stay within the guidelines, unless under a Supreme Court decision, which came out about eight years ago called the *Booker* case, the Judge has some flexibility to either issue an upward or downward departure or, what is it, an upward or downward variance on the judge's his or her own volition, giving some reasons.

But the guidelines is generally where it's holding right now at 324 to 360 months under the guidelines.

I do want to state some notes that I have here. I think most of them I have covered. Again, I have read the full study from Rabbi Bryski. I have read letters from Rabbi Blacher, the Executive Director of the Chabad at The Woodlands; and Rabbi Fygenson the — no. One is — hold it a second. I want to get this straight because I appreciate all this coming in. And I know right where to go to the letters. Right. Rabbi Fygenson is a director of Chabad at Sugar Land. So I appreciate everybody taking the time to be here.

And you can remain — everybody can remain seated at this point.

After considering the factors under 18 United States Code Section 3553(a), I will issue a variance in this case, which I believe serves the underlying requirements of the factors of this particular statute.

It is the order of the Court that the defendant is hereby committed to the custody of the Bureau of the Prisons — and this is how I had it broken down in my notes — for a term of 120 months as to Count 1S [the conspiracy to commit health fraud count]. And instead of 204 months, 120 months as to Count 2S [the conspiracy to commit money laundering count] to run consecutively, one after the other, for a total of 240 months.

After pronouncing the restitution order, the court asked Gozes-Wagner's counsel if he had anything else to add. He stated: "We object to the sentence just to preserve the objection."

Gozes-Wagner's sentence is by far the lengthiest among her co-conspirators. Shiforenko was sentenced to 72 months (six years). Voronov was sentenced to the statutory maximum 60 months (five years). And Brodsky has not been sentenced yet. But given that he faces a 60-month statutory cap, his sentence will be significantly shorter than Gozes-Wagner's.

14

No. 19-20157

## II. Discussion

Gozes-Wagner's primary argument on appeal is that the district court violated her constitutional rights by improperly sentencing her more severely than her "more culpable" co-conspirators simply because she exercised her right to go to trial and they did not. She contends that this amounted to an unconstitutional "trial penalty." Gozes-Wagner also argues that her sentence is infected with procedural and substantive error. For these reasons, she asks us to vacate her sentence and remand her case for re-sentencing before a different judge. Gozes-Wagner also challenges several aspects of the order of restitution. We address each argument in turn.

### A. Trial Penalty

The Sixth Amendment gives criminal defendants "the right to a speedy and public trial." U.S. CONST. amend. VI. And the Supreme Court has stated that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Thus, "a defendant cannot be punished by a more severe sentence because he unsuccessfully exercises his constitutional right to stand trial." *United States v. Devine*, 934 F.2d 1325, 1338 (5th Cir. 1991).[7]

---

[7] We pause here to note that the Government asks us to review this claim for plain error, while Gozes-Wagner insists that de novo review should apply. A panel of this court in an unpublished opinion applied plain error review to a claim similar to Gozes-Wagner's that was not raised before the district court. *United States v. Guy*, 633 F. App'x 851, 855 (5th Cir. 2015) (per curiam). Here, even though Gozes-Wagner's counsel did not use the "trial penalty" phrase at the sentencing hearing, nor did he expressly frame his argument in constitutional terms, he did zealously argue that it was unfair to sentence Gozes-Wagner more harshly than her pleading co-conspirators even though they pled guilty and she went to trial. Arguably, defense counsel's complaint about Gozes-Wagner's sentence was sufficient to trigger the more lenient review standard applicable to preserved errors. In any event, we need not decide this issue, because Gozes-Wagner's claim fails even under de novo review.

15

No. 19-20157

These broad principles guide our inquiry. And yet, in this particular case, we have little guidance from either the Supreme Court or prior panels of this court. The Supreme Court has never addressed a "trial penalty" claim like Gozes-Wagner's. *But cf. Alabama v. Smith*, 490 U.S. 794, 795 (1989) (considering whether a "presumption of vindictiveness" applies when a defendant receives one sentence after pleading guilty and then a harsher sentence following a trial that arose after the guilty plea was vacated on appeal); *Bordenkircher*, 434 U.S. at 358 ("The question . . . is whether the Due Process Clause . . . is violated when a state prosecutor carries out a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged."); *North Carolina v. Pearce*, 395 U.S. 711, 713 (1969) ("When at the behest of the defendant a criminal conviction has been set aside and a new trial ordered, to what extent does the Constitution limit the imposition of a harsher sentence after conviction upon retrial?"), *overruled in part by Smith*, 490 U.S. at 795.

In fact, the phrase "trial penalty" has never been used by either the Supreme Court or this court to describe a claim like Gozes-Wagner's. It is unsurprising, then, that most of the in-circuit caselaw cited by her for support is not directly on point. *E.g.*, *Thomas v. United States*, 368 F.2d 941, 942 (5th Cir. 1966) (vacating sentence where district court sentenced the defendant to "the maximum term permitted by law" after the defendant chose to go to trial after being advised by the court that it had "no doubt whatsoever as to his guilt" and "if he persisted in his denial that he participated in the crime, the court would . . . take that into account" at sentencing); *United States v. Rogers*, 504 F.2d 1079, 1085 (5th Cir. 1974) (vacating sentence where the district court told the defendant, who had been convicted as part of a marijuana conspiracy, that it "would not consider a lesser sentence" until he cooperated with the Government to bring "others involved in the conspiracy to justice.").

16

No. 19-20157

The Government, meanwhile, points us to in-circuit precedents directing us not to compare Gozes-Wagner with her cooperating co-conspirators when assessing her trial penalty claim. *United States v. Johnson*, 679 F.2d 54 (5th Cir. 1982) ("The government is permitted to encourage guilty pleas by offering substantial benefits to a defendant, and Johnson, having rejected the offer of a plea bargain, cannot complain that his codefendants received the benefit of a lighter sentence."); *United States v. Devine*, 934 F.2d 1325 (5th Cir. 1991) (refusing to compare the defendants' sentences to their co-conspirators who pleaded guilty and cooperated with the Government because the cooperators' "sentences [were] obviously the result of leniency and are not relevant to the present constitutional inquiry."); *United States v. Guy*, 633 F. App'x 851, 855 (5th Cir. 2015) (per curiam) (unpublished) (rejecting a due process challenge to a sentence imposed that was harsher than those imposed on the defendant's co-conspirators because they "received leniency from the government based on their agreement to cooperate").

Thus, to the extent Gozes-Wagner's claim depends on a comparison with her co-conspirators, only Voronov is relevant, because he did not cooperate, he pled guilty, and he received a sentence substantially lower than Gozes-Wagner even though his participation in the conspiracy was similar to hers.[8]

Given the scarcity of Fifth Circuit cases germane to Gozes-Wagner's claim, she understandably seeks support from our sister circuits. *See United States v. Mazzaferro*, 865 F.2d 450 (1st Cir. 1989); *Government of the Virgin Islands v. Walker*, 261 F.3d 370 (3d Cir. 2001); *United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2018). But these decisions are readily distinguishable.

---

[8] Like Gozes-Wagner, Voronov helped oversee the fraudulent scheme by assisting with the operation of testing facilities. He recruited doctors and other medical professionals to further the conspiracy. He supervised "seat warmers." He helped hide the fraudulent nature of the scheme through the use of numerous bank accounts. The record shows that Gozes-Wagner "took over" for Voronov when he left the conspiracy in 2014.

17

*Walker* involved a district court that improperly inserted itself into the plea negotiation process by refusing to accept guilty pleas from both Walker and his co-defendant, sentencing Walker to the statutory maximum after he was convicted at trial. 261 F.3d at 374–76. And in *Hernandez*, unlike here, the Ninth Circuit emphasized that the district court's comments about the defendant's decision to go to trial "comprised virtually the entirety of the explanation for the sentence." 894 F.3d at 1111. "Indeed, the court did not reference *any* particular 'facts of this case' or 'particular record' beyond Hernandez's exercise of his constitutional rights." *Id.* (emphasis added). Finally, *Mazzaferro* involved three defendants all charged with the same offense. Here, however, Gozes-Wagner and Voronov were ultimately charged with different crimes that carried different statutory maximum sentences. Although they may have participated similarly in the conspiracy, our job is not to look at their two sentences and decide whether we think Voronov and Gozes-Wagner should have been punished more equally based on their conduct.[9] Instead, our duty is to determine whether the district court sentenced Gozes-Wagner more harshly than it otherwise would have because she went to trial instead of pleading guilty. And on this record, we cannot say that it did.[10]

---

[9] In fact, we question whether it is appropriate on appellate review to weigh, as Gozes-Wagner requests, the ultimate sentences of each defendant when, at the time of sentencing, the district court only had the guilty pleas—not the ultimate sentences received by the others—to consider. Because our decision does not turn on the ultimate sentences received by each defendant but instead on the facts presented before the district court at the time of sentencing, we need not decide whether, in comparing co-defendants in a trial penalty claim, it is improper to consider sentencing outcomes that the district court did not have the benefit of considering.

[10] To the extent the scope of co-defendants participation in criminal activity is relevant to determining whether the district court improperly punished a defendant for going to trial, *Mazzaferro* is further distinguishable on the ground that the defendant there received a "sentence twice as long as that of" his co-defendant even though the defendant "had a much more limited role in the drug operation." 865 F.2d 450, 457–58. Yet, as discussed, the record indicates Gozes-Wagner and Voronov's participation in the fraudulent scheme was similar.

We cannot compare apples to oranges when deciding whether a sentence is "more severe" for trial penalty purposes. Nevertheless, a comparison of *any* kind is not strictly necessary to make out a trial penalty claim. For example, if the district court plainly stated that it was punishing the defendant more severely than it otherwise would *because* she went to trial, that would clearly amount to a constitutional violation even absent a comparison to others similarly situated to the defendant. *See Thomas*, 368 F.2d at 942. But that did not happen here.

We recognize that most—if not all—cases will not be so cut-and-dried, and that a defendant's constitutional rights may be violated even absent such an explicit statement. In those cases, it is the comparison to others that necessarily sheds light on whether a constitutional violation occurred. If the only meaningful difference between defendants was that one went to trial and the others did not, and the trial-standing defendant received a much more severe sentence than the pleading defendants, it could very well be the case that vacatur of the sentence will be required on trial penalty grounds. But a defendant who cooperates with the Government is not similarly situated to one who refuses to do so. *Devine*, 934 F.2d at 1338–39. Nor are defendants similarly situated when they are convicted under different statutes that carry different maximum sentences. If the case were otherwise, we would be holding that the Constitution mandates that defendants convicted of committing different crimes be sentenced similarly if the conduct underling those convictions is similar. We see no such mandate in the Constitution or in the Due Process caselaw addressing claims like Gozes-Wagner's.

We are aware that the district court judge in this case presided over a four-day jury trial before sentencing the defendant. This gave the court a full appreciation of Gozes-Wagner and the conduct that led to her conviction. *See Alabama*, 490 U.S. at 801 ("[I]n the course of the proof at trial the judge may

gather a fuller appreciation of the nature and extent of the crimes charged. The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation."). We recognize that this very fact—that the district court presided over the defendant's trial—also serves as the primary ammunition for Gozes-Wagner's claim. But we cannot help but observe the tension created by the fact that the court here was much more informed than most sentencing courts, which usually lack the benefit of a full-fledged trial before sentencing. *See Lafler v. Cooper*, 566 U.S. 156, 170 (2012) ("[C]riminal justice today is for the most part a system of pleas, not a system of trials."). We do not mean to suggest that a trial penalty claim is never tenable *because* the district court was highly informed at sentencing. Instead, we simply note the challenge both for defendants presenting such claims and for reviewing courts analyzing them. In the end, on this record, Gozes-Wagner has failed to show that the district court imposed an unconstitutional trial penalty on her at sentencing.[11]

## B. Procedural Unreasonableness

"In assessing reasonableness [of a sentence] on appeal, the court first must find no significant procedural error by the district court." *United States v. Lavalais*, No. 19-30161, 2020 WL 2609858, at *5 (5th Cir. May 22, 2020). "If there is no procedural error, the court may then review the substantive reasonableness of the sentence." *Id.* We therefore address Gozes-Wagner's procedural arguments before turning to her substantive argument.

---

[11] This conclusion is reinforced by the context in which the district court juxtaposed Gozes-Wagner's decision to go to trial with her co-conspirators' decisions to plead guilty. Although the district court referenced that decision several times during the sentencing hearing, the court did so prior to imposing its sentence. We infer that the district court's remarks regarding Gozes-Wagner's decision not to accept a plea were designed to explain why someone in her position could receive a heavier sentence, not that she should receive a lengthier sentence for exercising her right to a trial.

No. 19-20157

Gozes-Wagner's position is that the district court made three procedural errors when sentencing her: first, it misunderstood the discretionary nature of the Guidelines and improperly treated them as presumptively reasonable; second, it improperly failed to respond to her sentencing disparity argument with anything other than comments about her decision to go to trial compared to her co-conspirators' decisions to plead guilty; and third, it erred when it did not explain its decision to run her sentences consecutively. We address each argument separately.

**1. Discretionary Nature of the Guidelines**

Just before the district court pronounced Gozes-Wagner's sentence, it made the following comment:

> Under the guidelines — and a judge needs to stay within the guidelines, unless under a Supreme Court decision, which came out about eight years ago called the *Booker* case, the Judge has some flexibility to either issue an upward or downward departure or, what is it, an upward or downward variance on the judge's his or her own volition, giving some reasons. But the guidelines is generally where it's holding right now at 324 to 360 months under the guidelines.

Focusing on the "a judge needs to stay within the guidelines" language, Gozes-Wagner contends that the district court procedurally erred by failing to fully appreciate the discretionary nature of the Guidelines. Even though the court ultimately granted her a downward variance, Gozes-Wagner argues that her sentence was so affected by a presumption that her Guidelines range was reasonable that her sentence must be vacated.

The parties dispute the standard of review. Gozes-Wagner argues that she preserved the error, so abuse of discretion review should apply. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (explaining that preserved procedural errors, *e.g.*, "treating the Guidelines as mandatory," should be reviewed "under an abuse-of-discretion standard"). The Government responds that plain error

review should apply because Gozes-Wagner failed to raise this precise objection *after* the district court made the comment about "need[ing]" to stay within the Guidelines.

Federal Rule of Criminal Procedure 51(b) provides: "A party may preserve a claim of error by informing the court—when the court ruling or order is made *or sought*—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." FED R. CRIM. P. 51(b) (emphasis added). In arguing for a downward variance in her pre-sentencing memorandum, Gozes-Wagner noted:

> In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court declared that the federal guidelines should be advisory, and excised the limitations contained in 18 U.S.C. § 3553(b). 543 U.S. at 245, 259–60. The sentencing court's discretion is now significantly broadened and the court must make an individualized assessment of the facts of each case. *Gall v. United States*, 552 U.S. 38, 46 (2007).

At the sentencing hearing, and before the court pronounced its sentence, Gozes-Wagner's counsel reminded the court that there were "legal mechanisms via departures or variances" that the court could use to sentence Gozes-Wagner well below her Guidelines range. In our view, these actions were sufficient to preserve this error for appeal. Accordingly, we review for abuse of discretion.

A district court commits procedural error when it fails to recognize its discretion to vary from the Guidelines. *United States v. Clay*, 787 F.3d 328, 332 (5th Cir. 2015). As the Supreme Court has explained, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).

The district court's comments during the sentencing hearing reflect that it has a healthy respect for the Guidelines. As it should. Under 18 U.S.C. § 3553(a)(4), district courts are bound to consider a defendant's

applicable Guidelines range when determining a defendant's sentence. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) ("[A] sentencing court must 'give respectful consideration to the Guidelines[.]'") (quoting *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)). Failure to do so may constitute both procedural and substantive error.

There is obvious tension between statutory law *requiring* district courts to consider applicable Guidelines ranges and caselaw *prohibiting* the same judges from presuming such ranges to be reasonable. But caselaw helps illuminate the window of acceptable conduct that involves considering the applicable Guidelines range but refusing to presume that it is reasonable for a particular defendant.

For example, in *Nelson*, the district court expressly stated that "the Guidelines are considered presumptively reasonable," so "unless there's a good reason in the [statutory sentencing] factors . . . , the Guideline sentence is the reasonable sentence." 555 U.S. at 350–51 (internal quotation marks omitted). The Court held that this was procedural error. *Id.* at 352. It thus vacated the district court's "bottom of the range" sentence. *Id.* at 350, 352. Similarly, the Seventh Circuit vacated a within-Guidelines sentence even where the district court "obviously knew that the Guidelines [were] advisory" because the court noted that the defendant's attorney "had to deal with *the statutory scheme that is presumptively reasonable. . . .* So, that is where we start; and, in this case, that is where we end." *United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010). The district court in *Panice* also expressed discomfort in sentencing the defendant within the Guidelines, saying "I guess I just keep talking because *I do not want to get to where I have to go here, but I have to go there. I have to.*" *Id.* Taken together, the Seventh Circuit held that these comments, among others, left "too much doubt about whether the judge impermissibly" presumed the Guidelines range to be reasonable. *Id.* at 444. Other circuits have reached

the same result when considering equally problematic comments by district courts at sentencing. *United States v. Marrero*, 313 F. App'x 557, 558–59 (3d Cir. 2009) (unpublished) (vacating within-Guidelines sentence when court stated, among other things, "I take no pleasure, but I am going to follow the guideline range here"); *United States v. Raby*, 575 F.3d 376, 378 (4th Cir. 2009) (vacating a within-Guidelines sentence when the district court stated, among other things, that it understood a precedential opinion to hold that "the guidelines [were] presumptively correct" and that it seemed to think it was required to "completely ignore . . . the advisory nature of the guidelines").

The district court's statement here that "a judge needs to stay within the guidelines" comes close to creating ambiguity about whether the district court presumed the Guidelines range to be reasonable. But in context, the record shows that the district court neither failed to appreciate the discretionary nature of the Guidelines nor improperly presumed them to be reasonable.[12]

For starters, the court ultimately varied downward *seven years* from the bottom of Gozes-Wagner's Guidelines range. It also cited *Booker* immediately after making the comment-in-question. As stated by the Seventh Circuit in *Panice*, the district court "obviously knew that the Guidelines are advisory." *See* 598 F.3d at 441. Unlike in *Panice*, however, the record here shows that the court did not improperly presume the Guidelines range to be reasonable.

Two points during the sentencing hearing warrant emphasis. First, when Gozes-Wagner's counsel described her Guidelines range as "humbling, if not outright frightening," the court responded:

> Well, we know there are federal sentencing guidelines.
> The guidelines itself, the guidelines in this case start

---

[12] We emphasize that although a district court's comments at sentencing are an important factor of our review, we must consider them in the context of the entire hearing. One stray comment does not create error when it can be understood in the context of a lengthy sentencing hearing.

— start at 324 months. All right. 324 months. That's 27 years in the federal penitentiary with no parole, up to a maximum of 360 months, which is 30 years in the penitentiary with no parole. That's the guidelines themselves. So, yeah, it's a high-end case.

We think these comments reflect the district court's opinion that Gozes-Wagner's applicable Guidelines range was not reasonable but instead was unreasonably long. Second, even more reflective of the court's belief about the Guidelines range was its response to the Government's request that Gozes-Wagner be sentenced at the low end of the range. It was then that the court responded: "Low end of the guidelines? What? 324 months? That's 27 years."

Of course, perhaps nothing is more probative of the district court's thoughts on the Guidelines range than its decision to impose a significant downward variance. Considering the ultimate sentence imposed and the aforementioned comments by the court, we are convinced that the court did not improperly presume the Guidelines range to be reasonable. Thus, the district court did not abuse its discretion.[13]

## 2. Responsiveness to Sentencing Disparity Argument

Gozes-Wagner next argues that the district court procedurally erred by responding to her sentencing disparity arguments with nothing more than references to the fact that she went to trial and her co-conspirators pled guilty. Because she preserved this error, we review for abuse of discretion.[14]

---

[13] We note that even if the district court's "needs to stay within the guidelines" comment was sufficient to constitute procedural error, we believe the comment was harmless in light of the significant downward variance it ultimately imposed. There is no indication that the court's comment affected the below-Guidelines sentence it ultimately rendered. *See Clay*, 787 F.3d at 332 (noting that "the court may affirm the sentence in spite of a procedural error if that error is harmless" and that "[t]he proponent of the sentence has the burden of establishing that the error was harmless.") (quoting *United States v. Robinson*, 741 F.3d 588, 601 (5th Cir. 2014)).

[14] Again, the Government argues that Gozes-Wagner failed to preserve this error. We disagree. Her counsel focused on this issue to the exclusion of most others at the sentencing

No. 19-20157

At sentencing, the district court must "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). When the sentence imposed falls outside of the applicable Guidelines range, the court must go further, stating "the specific reason" for imposition of a non-Guidelines sentence. *Id.* § (c)(2). Additionally, when fashioning a defendant's sentence, the court must consider certain enumerated factors. *Id.* § 3553(a). Among them is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6).

In *United States v. Mondragon-Santiago*, this court held that the district court procedurally erred when it "did not give any reasons for its sentence beyond a bare recitation of the Guideline's calculation. This despite the fact that Mondragon-Santiago raised arguments before the district court concerning his family, his work history, and his prior convictions, all of which are relevant considerations under § 3553(a)." 564 F.3d 357, 363 (5th Cir. 2009). Of particular concern was the district court's failure to even "mention" the defendant's § 3553(a) arguments. *Id.*

Gozes-Wagner argues that the district court here erred in the same respect as the district court in *Mondragon-Santiago*. We disagree. The record shows that the court entertained and responded to Gozes-Wagner's sentencing disparity arguments at the sentencing hearing. In particular, when told by Gozes-Wagner's counsel that "sentencing disparity is going to be one of the main themes I'm coming to Your Honor with today," the court responded: "Well, with sentencing disparities — because I hear this a lot. Sentencing disparities, that basically means everybody on the same footing, correct, and it

---

hearing. Gozes-Wagner did not need to request an explanation for the sentencing disparity *after* her sentence had been pronounced to preserve this error. It was enough that she informed the court of the action she wished it to take and it rejected her invitation. *See* FED. R. CRIM. P. 51(b).

26

doesn't take into account, I don't believe, guilty pleas with a plea agreement with the government." This was after the court had already determined that Gozes-Wagner was *not* on the same footing as her co-conspirators. Earlier in the hearing, the court emphasized that Gozes-Wagner was convicted on two counts carrying a maximum combined sentence of thirty years, while none of her co-conspirators were convicted of more than one count, and none faced a maximum sentence higher than ten years. The court also highlighted the fact that some of the co-conspirators—namely, Shiforenko and Brodsky— cooperated with the Government, while Gozes-Wagner did not. This was yet another reason that she was not on the same footing as them for sentencing disparity purposes. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 767 (5th Cir. 2008) (holding that a district court did not abuse its discretion in considering a sentencing disparity argument even though the appellant's co-defendant was "more deeply involved in the conspiracy" and "received a sentence ten years less than his" because the co-defendant "pled guilty, provided information to law enforcement authorities, and did not flee before trial," making the two not "similarly situated"); *United States v. Ivory*, 783 F. App'x 325, 330 (5th Cir. 2019) (per curiam) (unpublished) (holding that "the court did not abuse its discretion by failing to consider disparities in the sentences of similarly-situated offenders" because the defendant did not demonstrate that "he and his co-conspirator were similarly situated").

For these reasons, this case also is distinguishable from the out-of-circuit authority relied on by Gozes-Wagner. *See United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir. 2017) ("The court ultimately sentenced the appellant to life imprisonment without so much as mentioning the disparity issue."); *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010) ("Nowhere in the sentencing hearing did the district judge discuss why sentencing Wallace to twice as long as White-Baber was appropriate."); *United States v. Smith*, 541

F. App'x 306, 308 (4th Cir. 2013) (per curiam) (unpublished) (holding that district court's explanation for its sentence resulted in procedural error where the court "provided only a brief response to Smith's argument that his limited criminal history warranted a downward variance sentence, and it did not specifically address Smith's assertion that his criminal history score was exaggerated").

As the Supreme Court has said, "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." *Gall*, 552 U.S. at 55. The district court therefore did not abuse its discretion.

### 3. Lack of Explanation for Consecutively Run Sentences

When the district court pronounced Gozes-Wagner's sentence, it did not explain its decision to run the two 120-month (10-year) sentences, one for each count of conviction, consecutively, for a total of 240 months (20 years) in prison. In fact, it did not provide any reason for the sentence *after* it was pronounced. Gozes-Wagner argues that this was procedural error. Because she did not raise this argument below, we review for plain error. FED. R. CRIM. P. 52 (b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1344, 1346–47 (2016) (applying plain error review to an unpreserved procedural sentencing argument). To succeed on plain error review, Gozes-Wagner must show: (1) error occurred; (2) it was plain, *i.e.*, clear or obvious; (3) the error affected her substantial rights, *i.e.*, she must show a reasonable probability that but for the error her sentence would have been different; and (4) that this court should exercise its discretion to correct the forfeited error because it seriously affected the fairness, integrity, or public reputation of the proceedings. *United States v. Randall*, 924 F.3d 790, 795–96 (5th Cir. 2019).

No. 19-20157

The Supreme Court has held that district courts should "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. This helps ensure compliance with 18 U.S.C. § 3553(c), which requires district courts to state in open court the reasons for imposing particular sentences. But neither the Supreme Court nor this court has ever held that a district court's failure to explain its rationale for imposing consecutive sentences constitutes procedural error.[15] Assuming, without deciding, that the district court did plainly err in failing to explain why it chose to sentence Gozes-Wagner to two consecutive sentences, such an error would not warrant vacatur of Gozes-Wagner's sentence. This is because she has failed to show "a reasonable probability that but for the error her sentence would have been different." *See Randall*, 924 F.3d at 796. The district court sentenced Gozes-Wagner to a total of 240 months in prison. It got there by sentencing her to 120 months on both the conspiracy to commit health care fraud and the conspiracy to commit money laundering counts. The conspiracy to commit money laundering conviction carried the higher statutory maximum—240 months (20 years)—as opposed to 120 months (10 years) for the conspiracy to commit health care fraud conviction.

Under U.S.S.G. § 5G1.2(d), "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence

---

[15] Several of our sister circuits have, however. *See, e.g.*, *United States v. Cochrane*, 702 F.3d 334, 346 (6th Cir. 2012) ("When deciding to impose consecutive sentences, . . . a district court must indicate on the record its rationale, either expressly or by reference to a discussion of relevant considerations contained elsewhere. Otherwise, meaningful appellate review becomes impossible."); *United States v. Conkins*, 9 F.3d 1377, 1385 (9th Cir. 1993) (same); *United States v. Rose*, 185 F.3d 1108, 1112 (10th Cir. 1999) (same).

equal to the total punishment." The PSR, which was adopted by the court at the sentencing hearing except to the extent it explicitly granted Gozes-Wagner's objections to it, noted this instruction. Thus, when the court chose to sentence Gozes-Wagner to 240 months total, but only 120 months on the count carrying the highest statutory maximum, the Guidelines directed it to impose the two sentences consecutively. Gozes-Wagner therefore has failed to show a reasonable probability that an explanation by the district court for running the sentences consecutively would have changed her total punishment. For that reason, she cannot overcome plain error review on this claim of error.

### C. Substantive Unreasonableness

Finding no reversible procedural error, we turn now to Gozes-Wagner's argument that her 240-month sentence is substantively unreasonable. "We review the substantive reasonableness of the sentence under an abuse-of-discretion standard." *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). Our review is "highly deferential" to the sentencing judge. *Id.* (quoting *United States v. Campos–Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008) (per curiam)). "The fact that we might reasonably conclude 'that a different sentence was appropriate is insufficient to justify reversal of the district court.'" *Id.* (quoting *Gall*, 522 U.S. at 51).

We presume that below-Guidelines sentences are substantively reasonable. *Id.* Nevertheless, a defendant can rebut this presumption by showing that her sentence: "(1) does not account for a [18 U.S.C. § 3553(a)] factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *Id.* at 558 (quoting *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013)).

Gozes-Wagner argues that her sentence is substantively unreasonable because the district court did not account for a factor that should have received

significant weight. More specifically, she argues that the court did not sufficiently account for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" under 18 U.S.C. § 3553(a)(6). But we have already held that, for § 3553(a)(6) purposes, none of her co-conspirators were similarly situated to her. In any event, this court has held that when a defendant is sentenced below her applicable Guidelines range, the unwarranted disparity factor "is not afforded significant weight." *United States v. Waguespack*, 935 F.3d 322, 337 (5th Cir. 2019).

As this court has made clear, "an argument premised primarily on sentencing disparity is insufficient to render a sentence substantively unreasonable." *United States v. Hernandez*, 633 F.3d 370, 379 (5th Cir. 2011) (citing *United States v. Key*, 599 F.3d 469, 475–76 (5th Cir. 2010)). Gozes-Wagner's reliance on distinguishable in-circuit and out-of-circuit health care fraud cases in which defendants received shorter sentences than hers is unpersuasive in this context. She has thus failed to show that her sentence was substantively unreasonable. *See United States v. Emordi*, No. 19-10400, 2020 WL 2488181, at *7 (5th Cir. May 14, 2020) (holding that the defendant failed to rebut the presumption that her below-Guidelines sentence was substantively unreasonable even though an allegedly "more culpable" defendant received a sentence just twelve months longer than her 85-month sentence).

*Amici curiae*, the Aleph Institute and other legal scholars, raise additional arguments not specifically espoused by Gozes-Wagner to support the claim that her sentence is substantively unreasonable. They first argue that the district court failed to properly consider "the nature and circumstances of the offense and the history and characteristics of the defendant" under § 3553(a)(1). But the record shows that the district court had a firm grasp of

31

both the nature and circumstances of Gozes-Wagner's offense *and* her history and characteristics. The court noted that Gozes-Wagner did not play merely "a marginal role" in the conspiracy, expressing particular distaste for health care fraud operations "like this one" that wreak "havoc" on Medicare and Medicaid. And having presided over the trial, read and adopted the PSR that described in detail the nature of the offense and her personal history, and read more than 80 character letters submitted on Gozes-Wagner's behalf, discussing several at length during the sentencing hearing, the district judge no doubt understood and considered her history and characteristics when imposing her sentence.[16]

Amici also argue that the court failed to consider "the kinds of sentences available" under § 3553(a)(3), explaining that neither of the statutes under which Gozes-Wagner was convicted *mandate* prison time. But we think the record shows that the district court spent considerable time fashioning Gozes-Wagner's sentence and considering alternatives. In addition to expressly stating—albeit summarily—that it had considered all the § 3553(a) factors, it also noted that at the outset of its pronouncement that "I do want to state that I have read this entire file and that right now the defendant could be facing up to 360 months." When explaining how it reached its sentencing decision, the court noted that the product was a result of "what I thought on my own." The court's failure to explicitly state that it had considered a sentence of no prison time at all does not constitute substantive unreasonableness under these circumstances.

Finally, amici argue that Gozes-Wagner's sentence is substantively unreasonable because the district court improperly focused on her decision to go to trial—an "improper factor" to consider—and, overall, the combination of

---

[16] The district court did note before pronouncing its sentence that it had considered the § 3553(a) factors.

these errors reflects "a clear error of judgment in balancing the sentencing factors." *See Simpson* 796 F.3d at 558. We do not find these arguments persuasive. Nothing in the record suggests that the court went out of its way to punish Gozes-Wagner for going to trial. To the contrary, when presented with arguments that she was similarly situated to her co-defendants, the district court correctly pointed out that for various reasons, including the fact that her co-conspirators pleaded guilty to charges carrying lower maximum sentences, she was not similarly situated to them at sentencing. The record does not reflect a clear error of judgment in the district court's balancing of the § 3553(a) factors. Accordingly, amici's additional arguments, which we consider in our broad discretion, do not persuade us that Gozes-Wagner's sentence is substantively unreasonable.

## D. Restitution: Procedural Claims

The PSR calculated the restitution Gozes-Wagner should owe based on "the bills Medicare paid within the limits in her count of conviction," *i.e.*, between January 2010 and February 2015, the time period for which Gozes-Wagner was charged in the superseding indictment with participating in the conspiracy. Because "the Medicaid losses [were] undetermined," the Medicare losses constituted the full amount for restitution calculation purposes at the sentencing hearing. For Gozes-Wagner, according to the PSR, that amounted to $19,808,841.87. The PSR recommended that she be held accountable "jointly and severally" with her convicted co-conspirators in varying amounts.

At the sentencing hearing, the district court noted Gozes-Wagner's objections to both the "responsibility" of restitution and the amount. At one point, the prosecutor explained that there was "one thing [he] wanted to raise." He asked the court to consider awarding restitution in the amount of $15,283,985 instead of $19,808,841.87. The court carefully noted the request, and Gozes-Wagner's counsel objected "to the calculations as modified."

After pronouncing her sentence, the district court turned to the matter of restitution. It stated:

> The defendant is being held responsible for restitution to the United States Medicare system in the total amount of $15,283,985 jointly and severally with Mikhail Shiforenko, S-h-i-f-o-r-e-n-k-o, up to an amount of $21,800,000; Alexandr Voronov, V-o-r-o-n-o-v, up to $18 million; and Boris Brodsky up to the amount of $6 million.
>
> It's further ordered the defendant pay to the United States a special assessment set up by the U.S. Congress for $100 per count of conviction. So that's $200. I find she does not have the ability to pay a fine, and I'll waive a fine in this case.
>
> And that — now, it sounds completely unrealistic, but I need to set a budget of some sort for repayment. It sounds completely unrealistic because it's subject to probation altering it later on. With that as a background, having assessed her ability to pay, pay in lump sum the amount of $200 due immediately. The balance due in 50 percent of any wages earned while in prison in accordance with the Bureau of the Prisons inmate financial responsibility program. Any balance remaining after release from imprisonment shall be due in monthly installments of $400 to commence 60 days after release from imprisonment to a term of supervision. Payment is to be made through the United States District Clerk, Southern District of Texas.

No further reference was made to restitution at the sentencing hearing.

On appeal, Gozes-Wagner raises three "procedural" challenges to the order of restitution. We address each before turning to her constitutional argument on the matter.

The first procedural claim is that the district court was under the false impression that it was obligated by law to hold Gozes-Wagner jointly and severally liable with her co-conspirators for various portions of the restitution

award. The second is that the court imposed an improper payment schedule by conceding that it was "completely unrealistic." And third, the court illegally included within the order loss attributable to conduct that occurred in 2010 and 2011 even though a prosecutor during closing argument conceded that Gozes-Wagner may not have been fully aware of the scope of the conspiracy during those years.

### 1. Joint and Several Liability with Co-Conspirators

Gozes-Wagner argues that the district court erred by relying on language in the PSR suggesting that she had to be held jointly and severally liable for the full amount of the loss to Medicaid during her participation in the conspiracy. Because Gozes-Wagner did not raise this error below, we review for plain error. *See United States v. Sheets*, 814 F.3d 256, 259 (5th Cir. 2016) (recognizing that plain error review applies to alleged restitution order errors that were not raised below and thus "den[ied] the court the opportunity to identify and correct any errors").

There is no dispute that Gozes-Wagner owes some amount of restitution. Because her conviction involved "fraud or deceit," the Mandatory Victims Restitution Act applies. 18 U.S.C. § 3663A(c)(1)(A)(ii). Further, under 18 U.S.C. § 3664(h),

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

Thus, not only was the court bound to render a restitution award against Gozes-Wagner, there is no doubt that it had the authority to hold her jointly and severally liable for the full loss to Medicaid that occurred during her participation in the conspiracy. Nevertheless, Gozes-Wagner asks us to

interpret the PSR's statement that she "is accountable for restitution to Medicare . . . jointly and severally with" her convicted co-conspirators and the district court's subsequent adoption of the PSR as an illegal determination by the district court that the law required it to hold her jointly and severally liable with her co-conspirators. We decline to do so. Thus, Gozes-Wagner has failed to show plain error.

### 2. "Completely Unrealistic" Payment Schedule

Next, Gozes-Wagner contends that it was error for the district court to impose a "completely unrealistic" payment schedule upon her. This is especially true in light of the fact that, at the time of sentencing, she possessed only $45,000 in assets and had low post-prison income-earning prospects. Because Gozes-Wagner failed to raise this argument below, we review for plain error. *United States v. Arledge*, 553 F.3d 881, 900 (5th Cir. 2008) ("Because Arledge failed to object to the district court's setting of the payment schedule, we review for plain error.").

Under 18 U.S.C. § 3664(f)(2), the district court was obligated to set a payment schedule for Gozes-Wagner's restitution award, despite the long odds that she will repay the full amount in her lifetime. It did the best it could. The PSR assessed Gozes-Wagner's ability to pay, and the court adopted its findings. Then it ordered her to pay $200 immediately, 50 percent of her prison wages during her incarceration, and $400 a month shortly after her release. Under the circumstances, this payment schedule did not constitute plain error.

### 3. Losses Attributed from 2010 and 2011

In the final minutes of his closing argument, a prosecutor made the following remark:

> And so let's give Ms. Wagner the benefit of the doubt. She is not a doctor. When she walks in, it may have taken her a bit longer, maybe all of 2010, maybe all of 2011. But come on, even somebody without medical

> training, by 2012, 2013, 2014 and part of 2015 is now receiving hundreds of thousands of dollars from Russians can't find any patients [sic], doesn't know what the clinics are doing, that's taking your leave a little slow. At that point in time she knew what was going on, she had knowledge or she intentionally ignored it.

Gozes-Wagner calls this a concession from the Government that Gozes-Wagner may not have known about the fraud involved in the conspiracy in 2010 and 2011. The Government responds that this off-handed "benefit of the doubt" comment did not amount to a concession; instead, loss from those years was properly included within her restitution award because she was convicted of defrauding Medicaid during those years. Gozes-Wagner did not raise this claim below, so we review for plain error. *See Sheets*, 814 F.3d at 259–60.

We cannot say that the district court plainly erred by attributing loss amounts in the restitution order for losses that indisputably occurred during the time period for which Gozes-Wagner was convicted. To say the Government made an evidentiary concession during the final moments of its closing argument is, at best, a stretch. We find no plain error.

### E. Restitution: Eighth Amendment's Excessive Fines Clause

Gozes-Wagner argues for the first time on appeal that the district court's restitution order violates the Excessive Fines Clause of the Eighth Amendment. We therefore review for plain error. *See United States v. $78,882.00 In U.S. Currency*, 464 F. App'x 382, 383 (5th Cir. 2012) (per curiam) (unpublished) ("Because the Salgados raise their Excessive Fines Clause theory for the first time on appeal, we review the district court's order of forfeiture for plain error.")

The Eighth Amendment prohibits the Government from saddling defendants with "excessive fines." U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted."). But the Supreme Court has never held that the Excessive Fines Clause applies to *restitution* awards. *See Paroline v. United States*, 572 U.S. 434, 455–56 (2014) ("To be sure, this Court has said that 'the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government.'") (quoting *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 268 (1989)). "As we ordinarily do not find plain error where there is an absence of authority on point, we decline to conclude that any error by the district court . . . was clear or obvious." *See United States v. Rubio-Sorto*, 760 F. App'x 258, 260 (5th Cir. 2019) (per curiam) (unpublished).[17] Hence, we once again find no plain error.

### III. Conclusion

For the foregoing reasons, we hold that Gozes-Wagner has failed to show that the district court reversibly erred. We therefore AFFIRM.

---

[17] We note that the only other circuit court to consider whether a restitution award could violate the Excessive Fines Clause squarely rejected it. *See United States v. Green*, 954 F.3d 1119, 1125 (8th Cir. 2020) ("As the Supreme Court pointed out in *Paroline*, mandatory restitution under § 2259 — when properly interpreted — does not violate the Eighth Amendment's excessive-fines clause.") (citing *Paroline*, 572 U.S. at 455–56). We leave for another day, however, the discussion of whether a restitution order could ever violate the Excessive Fines Clause.